94 N.J. Super. 228 (1967)
227 A.2d 539
FRANCES MAGRINE AND ALFRED MAGRINE, PLAINTIFFS,
v.
VINCENT KRASNICA, DEFENDANT.
Superior Court of New Jersey, Hudson County Court, Law Division.
Decided March 6, 1967.
*229 Mr. Lewis M. Holland argued the cause for plaintiffs (Messrs. Warren, Chasan, Leyner & Holland, attorneys).
Mr. Robert E. Tarleton argued the cause for defendant (Messrs. Beggans and Keale, attorneys; Messrs. Frohling and Gaulkin, of counsel).
LYNCH, J.S.C. (temporarily assigned).
The novelty of this case lies in the attempt by plaintiff,[1] a patient of defendant dentist, to extend the rule of "strict liability"[2] against defendant for personal injuries caused by the breaking of a hypodermic needle in plaintiff's jaw while being used by defendant in an injection procedure. The break was due to a latent defect in the needle.
Novelty, of itself, does not foreclose consideration of plaintiff's contentions in this field of developing tort law. Cf. DiCristofaro v. Laurel Grove Memorial Park, 43 N.J. Super. 244, 255 (App. Div. 1957) (in another area). Neither does it justify a headlong leap to impose strict liability unless, based on proper policy considerations and reason, such liability should be found. Plaintiff concedes that there is no precedent  anywhere  holding a dentist, or any other "user" of an article, strictly liable for injuries caused by a latent defect therein. Since the case is one of first impression, the court feels impelled to set forth its reasoning at some length.
The case is submitted for decision on a stipulation setting forth the following facts: On November 22, 1963 plaintiff was a patient of defendant. He was administering a local anesthetic with a hypodermic needle inserted in the left *230 temporomandibular space, a point at the extreme end of the lower gum beyond the last tooth. The needle extended 1 5/8" beyond the syringe. It had been assembled by the doctor just before the injection and had been used approximately eight times for about three weeks prior to the accident. It is the custom of the doctor to use about four needles a month and to discard them at the end of the month. As the injection was being made the needle "separated" at the hub, the place where the needle entered the syringe, leaving the entire 1 5/8" length of the needle in plaintiff's jaw. Defendant does not know what caused the needle to break, but he believes there must have been some sort of defect in it. He does not know from whom he purchased the needle. However, he testified on oral deposition that the needle was manufactured by a certain Precision Bur Company of New York, but in answers to interrogatories he had suggested other possible manufacturers.
Paragraph 22 of the stipulation of facts reads as follows:
"Plaintiffs make no assertion or claim that defendant failed to do what a reasonably prudent person would have done under the circumstances or that defendant did what a reasonably prudent person would not have done. Plaintiffs rely upon strict liability, breach of warranty and breach of contract to recover. They do not assert the negligence of defendant except insofar as negligence may be included in the above theories of liability."
We have seen the rapid development of the "strict liability" concept in the products liability field. It has been chronicled by the leading authorities. Among the more dramatic and complete reviews are those of Prosser, "The Assault upon the Citadel (Strict Liability to the Consumer)," 69 Yale L.J. 1099 (1960), and "The Fall of the Citadel[3] (Strict Liability to the Consumer)," 50 Minn. L.R. 791 (1966). See others noted in the latter article at p. 794, n. 9. Prosser fittingly credits New Jersey with having administered the crucial blow *231 upon the "citadel of privity" in the historic Henningsen v. Bloomfield Motors, Inc. case, 32 N.J. 358 (1960). As to particular products, the doctrine of strict liability had its genesis in food and drink. Prosser: "The Fall," supra, at p. 791. The rapidity of recent movement is shown by the history of § 402A of the Restatement of Torts 2d. As originally drafted in 1961 it was limited to "food for human consumption." In 1962 it was revised to include other products for "intimate bodily use," and in 1964 it was again revised to apply to "any product." Prosser, "The Fall," supra, at p. 793, n. 9. More recently, we in New Jersey have seen it move from Henningsen, supra (holding liable a manufacturer of automobiles), to Santor[4] (manufacturer of rugs), to Schipper[5] (mass seller of homes) and, finally, moving out of the "sales" field, to Cintrone[6] (lessor of a "U-Drive-It" truck held strictly liable for injuries caused by a defect in the vehicle).
Inspired by the holding in Cintrone, and the authorities cited therein, to the effect that "strict liability" is not confined to "sales" transactions, plaintiff conceives that the gates are wide open, at least to the extent that the doctrine should be applied "to service contracts, and particularly to those involving the use of manufactured implements in the performance of the service."
Plaintiff's argument moves from the major premise that "strict liability" is not confined to "sales," through the minor premise that the basic policy considerations of the doctrine apply to the use of a needle by a dentist, and concludes that he should be held liable though free from negligence. Since the major premise is established (Cintrone), it therefore remains for us to analyze the policy considerations projected by our decisions and other authorities and determine to what extent, if any, they postulate a judgment for plaintiff.
*232 Quoting from 2 Harper and James, Law of Torts, § 28.19, p. 1576 (1956), plaintiff asserts that the relevant policy considerations are as follows:
"Warranties may be imposed or annexed to a transaction by law, because one party to the transaction is in a better position than another (1) `to know the antecedents that affect * * * the quality of the thing * * *' dealt with; (2) to control those antecedents; (3) and to distribute losses which occur because the thing has a dangerous quality; (4) when that danger is not ordinarily to be expected; (5) so that other parties will be likely to assume its absence and therefore refrain from taking self-protective care."
It should be noted that Harper and James project the said considerations in support of their contention that implied warranties should not be restricted to sales of goods and should be applied elsewhere where the "same considerations obtain." How far outside the field of "sales" they should apply they do not say, except to take note that their views are supported in cases where a commodity is leased or otherwise the subject of a bailment for consideration, and that the rule should be applied to other situations by "suggestive analogy." In any event, the title of the chapter in which the views were expressed is, "Liability of Suppliers of Chattels" (emphasis added). It is to such "suppliers" that all their comments and citations relate. However, we accept the approach of Harper and James and others (e.g., Farnsworth, "Implied Warranties of Quality in Non-Sales Cases," 57 Colum. L. Rev. 653, 667 (1957)), as to whether the considerations stated apply "by suggestive analogy" to the instant situation.
At first glance it would appear that, indeed, defendant dentist is in a "better position" "to know the antecedents that affect * * * the quality" of the needle he used and "to control those antecedents" than his patient  this for the reason that he selected his own supplier and presumably the particular needle. Literally, therefore, the first policy consideration would appear to be satisfied. But does the statement of Harper and James coincide with the sense of the concept as applied by our Supreme Court?
*233 In Henningsen the court expressed the policy consideration in these words:
"The ordinary layman, on responding to the importuning of colorful advertising, has neither the opportunity nor the capacity to inspect or to determine the fitness of an automobile for use; he must rely on the manufacturer who has control of its construction, and to some degree on the dealer who, to the limited extent called for by the manufacturer's instructions, inspects and services it before delivery." (32 N.J., at p. 384; emphasis added)
In Santor it was stated:
"The manufacturer is the father of the transaction. He makes the article and puts it in the channels of trade for sale to the public. No one questions the justice of a rule which holds him liable for defects arising out of the design or manufacture * * *." (44 N.J., at p. 59; emphasis added)
and further, that the purpose of manufacturers' strict liability in tort:
"is to insure that the cost of injuries or damage, either to the goods sold or to other property, resulting from defective products, is borne by the makers of the products who put them in the channels of trade, rather than by the injured or damaged persons who ordinarily are powerless to protect themselves." (at p. 65; emphasis added)
In Schipper the court repeated the same rationale, saying:
"When a vendee buys a development house from an advertised model, as in a Levitt or in a comparable project, he clearly relies on the skill of the developer and on its implied representation that the house will be erected in reasonably workmanlike manner and will be reasonably fit for habitation. * * * The public interest dictates that if such injury does result from the defective construction, its cost should be borne by the responsible developer who created the danger and who is in the better economic position to bear the loss rather than by the injured party who justifiably relied on the developer's skill and implied representation." (44 N.J., at p. 91; emphasis added)
Finally, in Cintrone Justice Francis said:
"Warranties of fitness are regarded by law as an incident of a transaction because one party to the relationship is in a better position *234 than the other to know and control the condition of the chattel transferred and to distribute the losses which may occur because of a dangerous condition the chattel possesses." (45 N.J., at p. 446; emphasis added)
And, again:
"The operator of the rental business must be regarded as possessing expertise with respect to the service life and fitness of his vehicles for use. That expertise ought to put him in a better position than the bailee to detect or to anticipate flaws or defects or fatigue in his vehicles. Moreover, as between bailor for hire and bailee the liability for flaws or defects not discoverable by ordinary care in inspecting or testing ought to rest with the bailor just as it rests with a manufacturer who buys components containing latent defects from another maker, and installs them in the completed product, or just as it rests with a retailer at the point of sale to the consumer." (at p. 450; emphasis added)
Thus, in all of our recent cases strict liability was imposed (except with respect to a retail dealer) upon those who were in "a better position" in the sense that they created the danger (in making the article  Henningsen, Santor, Schipper and Jakubowski),[7] or possessed a better capacity or expertise to control, inspect and discover the defect (Henningsen, Santor, Schipper, Jakubowski and Cintrone) than the party injured. In these respects the dentist here was in no better position than plaintiff. He neither created the defect nor possessed any better capacity or expertise to discover or correct it than she.
It is further very clear that strict liability was imposed in our New Jersey cases for the essentially basic reason that those so held liable put the product "in the stream of trade and promote its purchase by the public." (Henningsen, supra, at p. 384; Santor, supra, at pp. 59, 60; Schipper, supra, at p. 89; Cintrone, supra, at p. 450). The learned treatises recognize the same basic policies. Prosser, Law of Torts (3d ed. 1964), § 97, at p. 674; Restatement, Torts 2d, § 402A, comment *235 (c); Harper and James, supra, § 28.16, at p. 1573. Defendant dentist did not put the needle in the stream of commerce or promote its purchase.
It may be logically argued that the foregoing analysis does not effectively distinguish defendant from the retail dealer who, for example, sells food in a sealed container, or otherwise has no opportunity to discover a defect in the article he sells,[8] and who nevertheless is liable for breach of warranty. Sofman v. Denham Food Service, 37 N.J. 304 (1962). See Harper and James, supra, § 28.30, at p. 1600, n. 3, 4, 5. In this respect such retail dealer is in no better position to discover the defect than the dentist here. Nevertheless, the situations are distinct. In the first place, the Uniform Sales Act and the Uniform Commercial Code, legislative enactments, apply to sales and there can be no judicial construction which could deny a warranty against a retail seller. At common law the implied warranty was originally confined to food. Prosser, Law of Torts, supra, § 97, p. 674. Even so, several courts have refused to impose warranty liability on the "innocent" retailer who has no means of discovering the defect in the goods. Harper and James, supra, § 28.30, p. 1600, n. 5. Such reasoning is not without a concept of fairness. Prosser suggests that other courts may follow this position but that he would hold such a dealer liable. "The Fall," supra, p. 815. Of more meaningful significance is a recognition that the essence of the transaction between the retail seller and the consumer relates to the article sold. The seller is in the business of supplying the product to the consumer. It is that, and that alone, for which he is paid. A dentist or a physician offers, and is paid for, his professional services and skill. That is the essence of the relationship between him and his patient.
Prosser, in announcing the "Fall of the Citadel," supra, with metaphorical reference to the "sack and slaughter" *236 which may follow such a conquest (at p. 791), reviews the rapid advances made in the application of strict liability. Then he pulls up short with the query as to "What defendants?" should be subject to the concept. He flatly states:
"In all of the cases in which strict liability has been accepted and applied, the defendant has been engaged in the business of supplying goods of the particular kind. So far as can be discovered, the question has not even arisen as to whether the rule might apply to one who is not so engaged. One may predict with some assurance that it will not." (at p. 814; emphasis added)
See also, Restatement, Torts 2d, § 402A (1) (a). Defendant dentist is not in the business of supplying needles.
A review of all the authorities reveals that their studies are directed to the liability of the "supplier." Section 402A of the Restatement is a subdivision of chapter 14, entitled "Liability of Persons Supplying Chattels for the Use of Others." See also Prosser, Law of Torts, supra, § 95 and Harper and James, supra. Nowhere, so far as court and counsel have been able to discover, is there a suggestion that one rendering medical or dental service and merely using an instrument is said to be a "supplier." All of our cases, Henningsen, Santor, Schipper and Cintrone, involved those who "supplied" the article to another. In Cintrone, Justice Francis said:
"Warranties of fitness are regarded by law as an incident of a transaction because one party to the relationship is in a better position than the other to know and control the condition of the chattel transferred and to distribute the losses which may occur because of a dangerous condition the chattel possesses. These factors make it likely that the party acquiring possession of the article will assume it is in a safe condition for use and therefore refrain from taking precautionary measures himself." (Emphasis added)
Farnsworth, "Implied Warranties of Quality in Non-Sales Cases," 57 Colum. L. Rev. 653 (1957), effectively argues for extension of warranty or strict liability beyond mere "sales" cases. We in New Jersey are beyond that. Cintrone, supra. He proposed the extension to bailments and contracts for *237 work, labor and materials, but nowhere does he suggest strict liability in a case such as this. He does cite some cases which, by analogy, approach the instant situation. In Watson v. Buckley, [1940] 1 All E.R. 174 (K.B. 1939), a hairdresser was held liable for an implied warranty for injuries caused by a defective hair dye used on plaintiff's hair.[9] In Dodd v. Wilson, [1946] 2 All E.R. 691 (K.B.), veterinary surgeons were held liable for injuries to cattle caused by a poisonous toxoid with which the cattle had been vaccinated. The cases are remotely analogous because they involve warranties, in part at least, as to services. The analogy fails, however, when it is recognized that not only were services involved but the defective products were also supplied by the defendants to the plaintiffs.
Farnsworth also cites the "bad blood" case of Perlmutter v. Beth David Hospital, 308 N.Y. 100, 123 N.E.2d 792 (1954), a case upon which defendant here relies. There the New York Court of Appeals, by a sharply divided court, held that the defendant hospital was not liable on warranty, basically because, as the majority held, it was not a "sale." Farnsworth properly, I think, is critical of the latter reasoning. It is doubtful that New Jersey would follow Perlmutter, at least insofar as it holds that a "sale" was not involved or that such description of the transaction is necessary to establish strict liability. See cases cited, supra. Perhaps a more valid ground for the decision is the majority's secondary consideration that, because it is impossible to avoid some portion of hepatitis strain in blood used for transfusion, strict liability should not be applied. Cf. Russel v. Community Blood Bank, Inc., 185 So.2d 749 (Fla. D. Ct. App. 1966), and Prosser, "The Fall," supra, p. 812. I would also accept the majority's basic principle *238 that the transaction may be classified in terms of the "essence" of the relationship involved, i.e., "what the patient bargains for?"  whether "service" or "product." This principle is not repudiated by the dissent in Perlmutter, which applies it, but finds that the essence of the transaction was a sale. The dissent further stresses that the doctors in that case, unlike the dentist here, had nothing to do with the transaction. 123 N.E.2d, at p. 796. In any event, again, the hospital in Perlmutter was a "supplier." The dentist here was not.
Plaintiff also invokes the policy consideration of "spreading of the risks"  the concept which suggests that defendant could cover his liability by insurance, or he could be held harmless by impleading his supplier or manufacturer (Schettino, J., concurring in Sofman v. Denham Food Service, Inc., supra, 37 N.J., at p. 314); Dodd v. Wilson, supra; Prosser, Law of Torts, supra, p. 654; Keeton, "Products Liability  Some Observations about Allocation of Risks," 64 Mich. L. Rev. 1329 (1966); Restatement, Torts 2d, § 402A, Comment (c); Prosser, "The Assault," supra, at p. 1120. The "risk distributing theory" is a relevant consideration. But again, we must appreciate the context in which it has been applied in our cases. In Henningsen, Santor, Schipper and Cintrone it was considered in holding liable the manufacturer or lessor, who put the goods in the stream of commerce. Such a party may fairly be assumed to have substantial assets and volume of business, and a large area of contacts over which the risk can be widely spread. Cf. Prosser, "The Assault," supra, at p. 1120. It is the "large-scale" enterprise which should bear the loss. Harper and James, op. cit., § 28.33, p. 1605. The impact of liability upon such a defendant is miniscule in comparison with that of an individual dentist or physician. His means of "spreading the risk" could be by insurance or impleading his supplier or manufacturer. "Malpractice" insurance, however, does not cover implied warranty unless the policy "expressly covers contract claims." Hassard, "Your Malpractice Insurance Contract," 168 A.M.A.J. 2117, 2118 *239 (1958). In this very case defendant dentist is represented not only by counsel for his insurance carrier but also by his personal counsel because the carrier denies coverage. In any event, there are definite limits as to how far the argument of "risk-spreading" by insurance can go. As Prosser says in "The Assault":
"What insurance can do, of course, is to distribute losses proportionately among a group who are to bear them. What it cannot do and should not do is to determine whether the group should bear them in the first instance  and whether, for example, consumers shall be compelled to accept substantial price increases on everything they buy in order to compensate others for their misfortunes. Even the distribution of the losses through insurance may be a process that has its flaws." (at p. 1121; emphasis added)
So, here, if the dentist or physician were to obtain insurance covering strict liability for equipment failure, the risk would be spread upon his patients by way of increased fees. Can anyone gainsay the fact that medical and dental costs, and insurance therefor, are already bearing hard there? Witness the constant cry over increasing medical-surgical insurance premiums in New Jersey.[10] As a matter of principle, the spreading of losses to their patients subverts, rather than supports, the policy consideration that the loss should be imposed on those best able to withstand it, i.e., the manufacturer or other entity which puts the article into the stream of commerce. The "risk distribution" theory has some weight, but not nearly enough when laid beside other more basic considerations. It plays "only the part of a make weight argument." Prosser, "The Fall," supra, at p. 800; see also his caveat in n. 65.
Something can be said, by way of logical argument, in plaintiff's favor, for the policy consideration that if the *240 dentist be held liable he, as the retail seller of food in a sealed container, can implead the manufacturer and thus be used as a conduit to place the loss where it belongs. Cf. Harper and James, op cit., § 28.30, pp. 1600-1602. This, too, should be regarded as only a "makeweight" argument. While we fully appreciate the appeal of the suggestion that the retail dealer  or the dentist here  is the most convenient conduit to "fight out" liability with the ultimate manufacturer (Prosser, "The Fall," supra, at pp. 847, 848), we are not satisfied that in this case such circuity of action is appropriate. The "conduit argument is often of a very doubtful justification * * *." Keeton, "Products Liability," supra, at p. 1333. Here, as the stipulation says, defendant "does not know from whom the needle was purchased; he testified on oral depositions that the needle was manufactured by a certain Precision Bur Co. of New York, New York, but in answers to interrogatories Dr. Krasnica had suggested other possible manufacturers." Thus, plaintiff is not without remedy to reach the supplier by proper use of discovery procedures. If it be shown that identification of the supplier does not eventuate in this particular case, and both plaintiff and defendant are denied recourse to him, then our answer is that this is a "hard case" from which bad law should not flow. It is not the usual situation, for ordinarily the manufacturer can be reached. In our view it would be bad law to sustain plaintiff's contentions because the relevant policy considerations do not justify imposition of strict liability upon a dentist in the first, or last, instance. Further, the vast body of malpractice law, presumably an expression of the public policy involved in this area of health care, imposes upon a dentist or physician liability only for negligent performance of his services  negligent deviation from the standards of his profession. In the performance of his professional skill he has control of what he does. As to the instrument he uses, he has no control with respect to a latent defect therein. Why, then, should he be held strictly liable for the instruments he uses, as to which he has no control over latent defects, and liable only *241 for negligence in the performance of his professional services, which he does control? "Suggestive analogy" is useful, but reason and consistency of principle should not be totally disregarded.
The question of extending implied warranties to services has not been without attention. See Note, "Implied Warranties in Service Contracts," 39 Notre Dame Law 680 (1964). See also Rapson, "Products Liability under Parallel Doctrines: Contrasts between the Uniform Commercial Code and Strict Liability in Tort," 19 Rutgers L. Rev. 692, 696-697. The former note indicates that the cases reject such implication because they focus upon the essence of the transaction between the parties. Thus, in Gagne v. Bertram, 43 Cal.2d 481, 275 P.2d 15 (1954), the California Supreme Court reversed a lower court ruling that a "test hole digger" impliedly warranted his services, saying:
"Thus the general rule is applicable that those who sell their services for the guidance of others in their economic, financial, and personal affairs are not liable in the absence of negligence or intentional misconduct. * * * [Those who hire experts] purchase service, not insurance." (Emphasis added)
The note writer in 39 Notre Dame Law. 680 observes that the rule of Gagne as to "test hole diggers" is equally applicable to all who perform services for others, including doctors, attorneys and architects among others. (at p. 682 and n. 22). It is recognized that the last-cited cases do not involve use of defective equipment. Nevertheless, the essence of the transaction should govern here, as well.
We must consider, also, the consequences if we were to adopt the rule of strict liability here. The same liability, in principle, should then apply to any user of a tool, other equipment or any article which, through no fault of the user, breaks due to a latent defect and injures another. It would apply to any physician, artisan or mechanic and to any user of a defective article  even to a driver of a defective automobile. In our view, no policy consideration positing strict liability *242 justifies application of the doctrine in such cases. No more should it here.
In "The Fall," Prosser acclaims the conquest of the citadel of privity. But he reveals his foreboding that irrational sequellae may tarnish a worthy victory:
"The rest is the story of sack and slaughter, of riot, rape and rapine, that has added an evil luster to the names of Magdeburg and Badajoz, along with ancient Troy." (at p. 791)
This court considers that to impose "strict liability" on defendant dentist here would add an irrational consequence to the laudable progress thus far achieved in this field of tort law.
Judgment for defendant.
NOTES
[1] Reference is to plaintiff Frances Magrine. Her husband Alfred Magrine sues per quod.
[2] Plaintiff alternately calls her theory "breach of warranty" and "strict liability." We shall abide by "strict liability" as the proper label. Cf. Santor v. A & M Karagheusian, 44 N.J. 52, 66 (1965); Restatement, Torts 2d, § 402A; Prosser, "The Fall of the Citadel (Strict Liability to the Consumer)," 50 Minn. L. Rev. 791, 803, 804 (1966), and "The Assault upon the Citadel (Strict Liability to the Consumer)," 69 Yale L.J. 1099 (1960).
[3] Hereafter respectively referred to as "The Assault" and "The Fall."
[4] Santor v. A & M Karagheusian, Inc., 44 N.J. 52 (1965).
[5] Schipper v. Levitt & Sons, Inc., 44 N.J. 70 (1965).
[6] Cintrone v. Hertz Truck Leasing & Rental Service, 45 N.J. 434 (1965).
[7] Jakubowski v. Minnesota Mining and Manufacturing, 80 N.J. Super. 184 (App. Div. 1963), reversed on other grounds 42 N.J. 177 (1964).
[8] The analysis does apply to the retail auto dealer in Henningsen, who had service facilities and does inspect or have the opportunity to discover defects in an auto.
[9] But see Epstein v. Giannattasio, 25 Conn. Sup. 109, 197 A.2d 342 (Super. Ct. 1963), where it was held that a beauty parlor operator could not be held on breach of warranty for injury caused a patron by use of a hair dye. The court held that under Connecticut law there was no "sale of goods" but that the essence of the transaction was one of "service."
[10] See also President Johnson's Special Message to Congress on Health and Education, February 28, 1967, concerning "rising medical costs," and the President's previous request to the Secretary of Health, Education and Welfare to initiate a study of medical costs (August 1966).