167 N.J. Super. 156 (1979)
400 A.2d 562
OSCAR J. WOODS AND ELIZABETH W. WOODS, HIS WIFE, PLAINTIFFS,
v.
LUERTZING CORPORATION AND PAUL LUERTZING, ETC., DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided March 8, 1979.
*159 Mr. J. Robert McGroarty for defendants.
Mr. Joseph P. Testa for plaintiffs (Messrs. Testa & Testa, attorneys).
MILLER, J.S.C.
When a person is injured during experiments involving a patented machine alleged to contain design defects, may he sue on theories of strict liability and implied warranty, even though the injury-causing machine had not been sold to him nor has it ever been sold to date, if the creator of the machine advertises and demonstrates the machine with the apparent intent to market it in its existing condition?
*160 Plaintiff sues defendant on the grounds of negligence, strict liability and implied warranty for injuries sustained in the operation of defendant's "Glass Can-Tainer" machine. Defendant moves for partial summary judgment on the strict liability and implied warranty counts of the complaint, arguing that the machine was never placed in "the stream of commerce." Bexiga v. Havir Mfg. Corp., 60 N.J. 402, 410 (1972).
Plaintiff operates a small glass manufacturing business, commonly known as a "lamproom," from his garage. Defendant, now deceased, was a fair-sized glass manufacturer in another corporate name. Through the Luertzing Corporation defendant engaged, among other activities, in the creation and patenting of new inventions. Among them is the "Glass Can-Tainer," the injury-producing machine in this case.
The machine is a glass spinning device for use in the manufacture of glass containers. Defendant Luertzing hoped to revolutionize the canning industry with this patented invention in combination with another patented processing device that would cook containerized food much faster for food processers. Hopefully, marketing food in glass "cantainers" would prove more appealing to retailers and consumers. Unfortunately, the novel "Glass Can-Tainer," after nearly 15 years of development, has never successfully worked on a mass scale; hence, it has never been sold.
The only "Glass Can-Tainer" in existence is that involved in this case. Hoping that the softer glass used in plaintiff's "lamproom" would solve the problems with the machine, defendant contracted with plaintiff to aid in the further development of the machine. Plaintiff was to provide his facilities, glass material and his services and those of two of his employees; defendant was permitted to place his machine in plaintiff's shop for the purposes of the experiments. Defendant agreed to pay plaintiff $600 a day for his facilities and services.
*161 From the deposition excerpts filed it is clear that plaintiff knew that the machine was still being developed. On the day of the injury, the first day of operation in plaintiff's shop, defendant supervised the operation of the machine. Plaintiff worked the front end, sweeping aside glass remnants, cutting glass and keeping the mold in the spinning machine clear. After at least 100 unsuccessful attempts to produce a container, plaintiff reached in the front cover to clean out a piece of glass from the mold. He told defendant to stay away from the control panel; however, defendant had started the machine, catching plaintiff's hands and fingers and causing injuries thereto. The failure to provide adequate safety devices to prevent such an incident is the alleged design defect.
Defendant advertised this machine among the canning and glass industries. He took the machine to various cities to demonstrate it in an attempt to sell his ideas. Relying on these facts and the fact that the "Glass Can-Tainer" was patented, plaintiff argues that a factual issue exists as to whether the machine was in the "stream of commerce," relying principally on Bexiga, supra, and Rains v. Cascade Industries, 269 F. Supp. 688 (D.N.J. 1967), rev'd 402 F.2d 241 (3 Cir.1968).
The question presented is whether, notwithstanding the absence of a sale to plaintiff in this case, defendant's efforts to sell his invention elsewhere sufficiently place the product in the "stream of commerce" to cause the implied warranty of fitness for a particular purpose, N.J.S.A. 12A:2-315[1]; and the provisions for strict liability contained in § 402A of *162 Restatement, Torts 2d (1965)[2], to apply in this case. These provisions are set forth in the footnotes.
That a sale or leasing arrangement is not involved in this case as in the usual run of cases, e.g., Henningson v. Bloomfield Motors, Inc., 32 N.J. 358 (1960); Cintrone v. Hertz Truck Leasing, etc., 45 N.J. 434 (1965), does not end the inquiry; nor does the fact that defendant was not a "mass producer" of this machine shield him from warranty or strict liability, e.g., Patitucci v. Drelich, 153 N.J. Super. 177 (Law Div. 1977). As a "supplier" of a chattel, the policy considerations supporting strict liability and liability based upon implied warranties seemingly apply to this defendant. Magrine v. Krasnica, 94 N.J. Super. 228 (Cty. Ct. 1967), aff'd sub nom. Magrine v. Spector, 100 N.J. Super. 223 (App. Div. 1968), aff'd 53 N.J. 259 (1969), states the policy considerations:
Thus, in all our recent cases strict liability was imposed * * * upon those who were in "a better position" in the sense that they created the danger (in making the article * * *), or possessed a better capacity or expertise to control, inspect and discover the defect * * * than the party injured. * * * It is further very clear that strict liability was imposed in our New Jersey cases for the essentially basic reason that those so held liable put the product "in the stream of trade and promote its purchase by the public." [94 N.J. Super. at 234; citations omitted]
*163 This theory, abstractly applied, would warrant permitting plaintiff to present his proofs on the strict liability and warranty counts to the jury; however, the reality of the facts in this case prevent that result.
Both parties rely on the following language in Bexiga, supra:
Where a manufacturer places into the channels of trade a finished product which can be put to use and which should be provided with safety devices because without such it creates an unreasonable risk of harm, and where such safety devices can feasibly be installed by the manufacturer, the fact that he expects that someone else will install such devices should not immunize him. [60 N.J. at 410; emphasis supplied]
The law regarding design defects as stated in Bexiga has recently been refined by Cepeda v. Cumberland Engineering Co., Inc., 76 N.J. 152 (1978). Cepeda held that in design defect liability analysis "unreasonably dangerous" should be understood as substantially coordinate with negligence principles, with the qualification that foreseeability of the dangerous propensity is imputed, and that practical judicial implementation of the principle is supplied by a risk/utility analysis. Id. at 171-172. The analysis ultimately reaches the question whether, in light of the advantages to the using or consuming public offered by the product, a reasonably prudent manufacturer with knowledge of its harmful characteristics would place it on the market. Id. at 174. This is a fact question for the jury. However, before reaching the jury a determination that the product is "on the market" is necessary by the very nature of the test adopted.
Plaintiff asserts that because the machine is patented it must be a product that "can be put to use", otherwise it cannot be patented. Plaintiff then argues that there are presumptions that arise from the facts of the patent: that the patent is valid, that the product fills a need, that it entered into immediate use and that it met with pronounced success. Rains v. Cascade Industries, Inc., supra at 695. *164 Rains is a patent infringement litigation. The point of its discussion is that the fact that a product enters the stream of commerce and meets with sales success raises the presumption of the patent's validity. Plaintiff attempts to turn the presumption on its head. The facts of this case belie plaintiff's argument. This product was not commercially successful; in fact, it had not even been perfected for its intended use on the scale necessary to be successful. Thus, plaintiff's reliance on the fact that the machine is patented cannot support its position.
Plaintiff also argues that the advertisements and demonstrations used in defendant's attempt to sell the "Glass Can-Tainer" place the product in the stream of commerce. This argument has some facial appeal; however, it cannot succeed. The court in Santor v. A & M Karagheusian, Inc., 44 N.J. 52 (1965) stated:
It must be said * * * that when the manufacturer presents his goods to the public for sale he accompanies them with a representation that they are suitable and safe for the intended use * * * such representation must be regarded as implicit in their presence on the market * * * strict liability in tort is not conditioned upon advertising to promote sales. It arises from the mere presence of the product on the market. [at 64-65; emphasis supplied; citations omitted]
Santor gives substance to the concept of "stream of commerce." Advertising is a fact to be considered, but is not the central focus of inquiry. "Presence of the product on the market" must mean that the product itself is presently and physically sold, leased or its possession exchanged in some other arrangement for strict liability or warranty liability to arise. While defendant had placed this machine in plaintiff's shop, he supervised its operation to the point that he was at the control panel at the time of the injury-causing accident.
This is not a case like Delaney v. Towmotor Corp., 339 F. 2d 4 (2 Cir.1964), relied on in Cintrone, supra. In Delaney an employee of a stevedoring company was injured *165 when the overhead guard on a new hilo fork lift truck supplied by the defendant as a demonstrator for purpose of "trying it out to get acquainted with its newer type equipment" collapsed after seven weeks of use. Defendant manufacturer was held strictly liable as a supplier of the fork lift. In the instant case there was no surrender of control. Plaintiff here was not the target of a sales effort but was expressly hired to aid in the development of the machine. This fact raises policy considerations countervailing those that seemingly support strict or warranty liability in this case.
Both strict and warranty liability are premised on a manufacturer's better position to know, control, inspect and discover any defects in products that they market. E.g., Magrine v. Krasnica, supra. Indeed, a manufacturer has a duty to exercise reasonable care in placing a product on the market, which duty must be met by inspection and testing. E.g., O'Donnell v. Asplundh Tree Expert Co., 13 N.J. 319, 336-337 (1953). If strict or warranty liability is imposed on a manufacturer for injuries that occur during the inspection or testing of a product aimed at discovering any defects or at perfecting it for its intended use, then the essential purpose of imposing such liability on the manufacturer, that is, to insure that a user or consumer receives a fit and safe product, cannot be served because of the deterrent effect that such a holding would cause. Strict and warranty liability during the attempt to find out what a product can and cannot do, is senseless and can only deter the development of new products and processes. If knowledge of dangerous propensities is to be imputed to the manufacturer of a product, Cepeda, supra, there in fairness the manufacturer should have a means for testing the product without being threatened with strict liability while testing.
A further reason for not imposing liability for breach of the implied warranty of fitness for a particular purpose under N.J.S.A. 12A:2-315 is that, in this case and in all cases where goods are supplied to an individual or corporation *166 for the purpose of being tested, it is the supplier's purpose of discovering the capabilities and shortcomings of the thing being supplied that is the essence of the transaction. The supplier does not know enough about his product to market it; hence, he engages someone to help him find out, paying that person for his services and facilities. Plaintiff's purpose here was to earn the money promised for aiding in the development of defendant's product; he clearly had no purpose of his own for the use of the "Glass Can-Tainer" independent of defendant's testing purpose. Therefore, warranty liability per N.J.S.A. 12A:2-315 in this case is inappropriate.
Finally, whether or not the machine is commercially "reasonably fit for its intended purpose" is "obviously irrelevant to the postulate of strict tort liability to a workman injured by reason of the unsafety of the machine due to a design defect." Cepeda, supra 76 N.J. at 176. For the reasons set forth in this opinion, the postulate of strict liability cannot apply to this case in which plaintiff was not the buyer, lessor or ultimate user as recipient from a buyer or lessor, but was specifically hired to test the product supplied, which product had never been sold or leased.
Therefore, summary judgment is granted to defendant on the warranty and strict liability counts of the complaint. Plaintiff may proceed on his negligence counts.
NOTES
[1] N.J.S.A. 12A:2-315. Implied Warranty: Fitness for Particular Purpose.

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.
[2] 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer.
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.