**Cook v. Allegheny Housing
Rehabilitation Corporation**

C.P. of Allegheny County, no. GD 03-023803.

*James J. Gillespie Jr.,* for plaintiff Currington.
*Richard S. Matesic,* for plaintiff Mize.
*Samuel S. Floro,* for plaintiff Clark.
*David J. Watson,* for plaintiffs Cynthia and Davon Jones.
*Theodore E. Breault,* for plaintiffs Cook, Walker, Creighton, Marcedis Jones, Morris and Faucette.
*Elizabeth E. Deemer,* for defendant Trafford Corp.
*Michael F. Nerone, Krista Kochosky Orashan* and *Francis C. Rapp Jr.,* for plaintiffs Allegheny Housing Rehabilitation Co. and III Rivers Manor Associates.
*Krista Kochosky Orasha* and *John T. Pion,* for defendant Alletheny Housing Rehabilitation Corp.
*C. Leon Sherman,* for defendant Equitable Resources.

COLVILLE, *J.,* September 23, 2005—

## SECOND AMENDED OPINION

The relevant factual history of this case may be briefly stated as follows. On January 17, 2003, an explosion occurred at an apartment building in Pittsburgh, Pennsylvania. The explosion was allegedly caused by a natural gas leak from a section of pipes and/or valves owned, controlled and maintained by the defendant, Equitable Gas Company. It is the belief and assertion of the plaintiffs that a cracked valve on one of Equitable's underground distribution pipes permitted gas to leak from the

service pipe and migrate outside the designed distribution system, and ultimately under the plaintiffs' apartment building. Specifically, the plaintiffs do not assert or advance any theory which would support a finding that the natural gas that caused the explosion was delivered to the plaintiffs' premises through the plaintiffs' gas meter, or through any portion of Equitable's gas distribution system specifically dedicated to the plaintiffs' premises.

This court entertained oral argument on preliminary objections filed on behalf of defendant, Equitable Resources Inc., demurring to Counts 3, 4, 7 and 8 of the plaintiffs' amended complaint. These counts assert causes of action against Equitable sounding in breach of warranty and strict liability. Following argument, this court issued an August 16, 2005 order of court and opinion. (An amended opinion was filed on August 23, 2005.) Following reargument, conducted on September 19, 2005, this second amended opinion and an order of court incorporating the language required by 42 Pa.C.S. §702(b) was filed September 23, 2005.

The arguments presented on behalf of Equitable may ultimately be reduced to the assertion that 402A liability, and breach of warranty liability, may not be imposed upon Equitable because its delivery of natural gas constitutes only a "service" and not the "sale" of a product until, or unless, the natural gas travels through the meter of its customer, at which time the gas becomes the subject of a "sale"[1] and therefore a "product" for purposes

___

1. At argument on Equitable's motion for reconsideration and within Equitable's brief in support of motion for reconsideration, counsel for Equitable clarified Equitable's position that while a "sale" is not required, a "commercial transfer" event is required. In support of this

of 402A strict liability and breach of warranty law. In support of this assertion, counsel for Equitable references *Schriner v. Pennsylvania Power & Light Company,* 348 Pa. Super. 177, 501 A.2d 1128 (1985).

In *Schriner,* the plaintiffs sued an electric company (a Pennsylvania public utility), asserting that stray electricity emanating from the electric company's power lines caused infectious diseases in the defendant's dairy cattle that, in turn, resulted in the premature death of the cattle. The *Schriner* court initially noted that "[t]he appellate courts of this Commonwealth have not, however, directly addressed the possible application of strict liability, under the Restatement (Second) of Torts, to a supplier of electricity." 348 Pa. Super. at 184, 501 A.2d at 1131. The *Schriner* court goes on to review section 402A of the Restatement (Second) of Torts and purports to distill that section into five "constituent elements . . . (1) a product; (2) a sale of that product; (3) a user or consumer; (4) a defective condition, unreasonably dangerous; and (5) causation—that the product caused physical harm to the ultimate user or consumer, or to his property." *Schriner,* 348 Pa. Super. at 185, 501 A.2d at 1132. The court then noted that (in 1985) the question of whether electricity is a product for purposes of section 402A liability was an issue of first impression within the Commonwealth. After reviewing decisions of numerous jurisdictions, the

proposition Equitable cites to several cases: *Stecyk v. Bell Helicopter Textron Inc.,* 1996 WL 153555 (E.D. Pa. 1996); *Woods v. Luertzing Corp.,* 167 N.J. Super. 156, 400 A.2d 562 (App. Div. 1979); *Ettinger v. Triangle-Pacific Corp.,* 799 A.2d 95 (Pa. Super. 2002); and *Armstrong Rubber Co. v. Urquidez,* 570 S.W.2d 374 (Tex. 1978). Each of these cases may be fairly distinguished from the instant matter. See discussion *infra.*

*Schriner* court held that: "electricity can be a 'product,' within the meaning of section 402A." *Schriner,* 348 Pa. Super. at 187, 501 A. 2d at 1133.

The *Schriner* court then addresses the question of whether, under the facts in *Schriner,* a "sale" of the electricity occurred sufficient to satisfy section 402A. In this regard, the *Schriner* court curiously states:

"The *sale* of a product is fundamental to any strict liability claim. . . . With a product such as electricity, a literal 'sale' of the product may not be required; however, courts willing to call electricity a product have been consistent in holding that the electricity must have been placed into the stream of commerce before section 402A strict liability can attach. . . .

"Entry of electricity into the stream of commerce has been deemed to occur, generally, when the electricity leaves the transmission lines and passes through the customer's meter." 348 Pa. Super. at 187-88, 501 A.2d at 1133. (citations omitted) ( emphasis in original)

In support of this last proposition the *Schriner* court cited to *Pierce v. Pacific Gas & Electric Company,* 166 Cal. App. 3d 68, 212 Cal. Rptr. 283 (1985), where the California Court of Appeals stated:

"We emphasize that our holding is limited to cases where the electricity is actually in the 'stream of commerce,' and expected to be at marketable voltage. *In most cases this will mean the electricity must be delivered to the customer's premises, to the point where it is metered,* although the many variations in electrical systems prevent our drawing a 'bright line' at a particular point." *Pierce,* 166 Cal. App. 3d at 84, 212 Cal. Rptr. at 292. (footnote omitted) (emphasis added)

Further supporting its reasoning that electricity enters the "stream of commerce" when it passes through the customer's meter, the *Schriner* court quoted *Aversa v. Public Service Electric and Gas Company,* 186 N.J. Super. 130, 451 A.2d 976 (1982), where that court stated:

"Where, however, the electricity is no longer in transmission in the public right of way, but has been introduced into the stream of commerce by a *sale thereof or otherwise,* the liability of the electric company is no longer dependent upon a showing of negligence but may be based upon a product liability cause of action unrelated to fault." *Aversa,* 186 N.J. Super. at 135, 451 A.2d at 979. (emphasis in original) (citations omitted)

In this manner, the *Schriner* court arrives at its holding that:

"If electricity 'in a defective condition, unreasonably dangerous' passes through the meter of a user or consumer and into the stream of commerce, causing physical harm to the ultimate user or consumer, or to his property, the doctrine of strict liability in tort may be applied against the public utility which 'engaged in the business of selling such a product,' which product '[was] expected to and [did] reach the user or consumer without substantial change in the condition in which it was sold.'" Restatement (Second) of Torts §402A(1).

Contrary to its holding, the language of *Schriner* itself (and the case law cited by *Schriner*), allows for the possibility that a "sale" of the product may not always be required in order to impose 402A liability to electricity.

"With a product such as electricity, *a literal 'sale' of the product may not be required; . . .*" *Schriner,* 348 Pa. Super. at 187, 501 A.2d at 1133. (emphasis added)

"We emphasize that **our holding is limited to cases where the electricity is actually in the 'stream of commerce,' and expected to be at marketable voltage.** *In most cases this will mean the electricity must be delivered to the customer's premises, to the point where it is metered,* although **the many variations in electrical systems prevent our drawing a 'bright line' at a particular point.**" *Pierce,* 166 Cal. App. 3d at 84, 212 Cal. Rptr. at 292. (footnote omitted) (boldface added) (emphasis in original)

"Where, however, the electricity is no longer in transmission in the public right of way, **but has been introduced into the stream of commerce by** a *sale thereof or otherwise,* the liability of the electric company is no longer dependent upon a showing of negligence but may be based upon a product liability cause of action unrelated to fault." *Aversa,* 186 N.J. Super. at 135, 451 A.2d at 979. (emphasis in original) (citations omitted) (boldface added)

Surprisingly, the *Schriner* court does not address the Pennsylvania case law established by, and following, the Pennsylvania Supreme Court decision in *Franconi v. Gibsonia Truck Corp.,* 472 Pa. 362, 372 A.2d 736 (1977), where the court specifically held that a "sale" was not required to impose 402A liability. While the *Franconi* court dealt with neither electricity nor natural gas, it did address the question of whether a "sale" of a product was required to impose strict liability upon a supplier of a product. In this regard, the *Franconi* court began by noting Pennsylvania's recognition of strict liability recovery in *Webb v. Zern,* 422 Pa. 424, 220 A.2d 853 (1966), where the court adopted 402A of the Restatement (Sec-

ond) of Torts as the law of Pennsylvania. The *Francioni* court went on to state:

"On its face section 402A applies to *sellers* of defective products, and because the Restatement provides for distinct negligence liability rules for lessors of chattels it is arguable that section 402A is only applicable to sellers. On this basis, in *Speyer Inc. v. Humble* . . . the district court interpreting Pennsylvania law refused to extend strict liability to the lessor of an allegedly defective fuel pump. We cannot agree with the logic of *Speyer.* It too easily disregards the policy basis for strict liability which supports application of the rule to any supplier of a product who, because he is in the business of supplying products, assumes a special responsibility toward the consuming public." *Francioni,* 472 Pa. at 365-66, 372 A.2d at 738. (footnotes omitted) (citations omitted) (emphasis in original)

The *Francioni* court went on to state:

"By the adoption of section 402A, that [special] responsibility was placed on those who, through manufacturing and distribution, intend that products 'reach the market.' *Bialek v. Pittsburgh Brewing Co.,* 430 Pa. 176, 187 n.2, 242 A.2d 231, 236 n.2 (1968); Restatement (Second) of Torts §402A, Comments c and f. While section 402A speaks only in terms of 'sellers', the foregoing policy statement and accompanying citations demonstrate the propriety of extending its application to anyone 'who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, . . .' Restatement (Second) of Torts §402A, comment f. What is crucial to the rule of strict liability is not the means of marketing but rather the fact of market-

ing, whether by sale, lease or bailment, for use and consumption by the public. . . . Where the fundamental principles are applicable, the imposition of artificial distinctions will only frustrate the intended purpose." *Francioni,* 472 Pa. at 367, 372 A.2d at 738-39. (citations omitted)

*Francioni* concludes its analysis on this issue by citing to the decisions of numerous jurisdictions holding that a lessor of a product may be found strictly liable without a "sale" of the product, stating:

"All [of these jurisdictions] have premised their holdings on these pertinent factors: (1) In some instances the lessor, like the seller, may be the only member of the marketing chain available to the injured plaintiff for redress; (2) As in the case of the seller, imposition of strict liability upon the lessor serves as an incentive to safety; (3) The lessor will be in a better position than the consumer to prevent the circulation of defective products; and (4) The lessor can distribute the cost of compensating for injuries resulting from defects by charging for it in his business, *i.e.,* by adjustment of the rental terms. We find the reasoning of these opinions to be highly persuasive and hold that all suppliers of products engaged in the business of supplying products for use or consumption by the public are subject to strict liability for injuries caused by 'a defective condition unreasonably dangerous to the user or consumer or his property.' " *Francioni,* 472 Pa. at 368-69, 372 A.2d at 739.

The *Francioni* test has been recognized and applied in subsequent Supreme Court decisions. See *Nath v. National Equipment Leasing Corp.,* 497 Pa. 126, 439 A.2d 633 (1981); *Musser v. Vilsmeier Auction Co. Inc.,* 522 Pa. 367, 562 A.2d 279 (1989); *Cafazzo v. Central*

*Medical Health Services Inc.,* 542 Pa. 526, 668 A.2d 521 (1995).[2]

In *Kalumetal Inc. v. Hitachi Magnetics Corporation,* 21 F. Supp.2d 510 (W.D. Pa. 1998), the United States District Court for the Western District of Pennsylvania predicted that under Pennsylvania law, where an injury occurred as a result of a defect in a piece of machinery subject to a bailment agreement between the defendant/bailor and the possessor/bailee of the equipment, the "special responsibility" to the consuming public that is the predicate for section 402A liability under the *Francioni* test is established. Invited to adopt a narrow interpretation of what constitutes "on the market" for the purposes of section 402A, the district court declined to do so, stating:

"We believe that it is immaterial that the [allegedly defective] swarf[3] was merely given to Kalumetal for processing. We find that in providing Kalumetal with the swarf, Hitachi placed the product in the stream of commerce for the purposes of section 402A. The use made by the swarf by plaintiffs' employees is at least arguably a public use—the 'consuming public' to which Hitachi marketed the swarf. A contrary ruling would set a precedent which subverts the public policy underlining the section." *Kalumetal,* 21 F. Supp.2d at 515-16.

---

2. It is recognized that in each case, *Nath* involving a financier of machinery, *Musser* involving an auctioneer of farm machinery, and *Cafazzo* involving a physician implanting a mandibular prosthesis, the defendant was deemed to not be a seller/supplier for purposes of 402A liability.

3. A "swarf" is a mixture of fine metallic grindings and grinding fluid.

This court recognizes that while it is evident that no "sale" of the allegedly defective product occurred in either *Francioni* or *Kalumetal,* it is true that in both cases a "delivery" of the allegedly defective product, in fact, occurred. This court recognizes that neither *Francioni* nor any other Pennsylvania appellate court decision applying *Francioni* directly addresses the question of whether 402A strict liability may be imposed upon a supplier of a product whose "sale" or "delivery" is never technically consummated. In both *Francioni* and *Kalumetal,* the defective product was delivered as intended by the supplier. While this difference between the instant matter and the facts of *Francioni* and *Kalumetal* exists, this court is unable to conclude that the difference is a material difference. In this court's judgment, the question is not whether there was either a "sale" or a "delivery" of the product; but rather whether the product was placed into the "stream of commerce."

Returning to the language of *Francioni:* "By the adoption of section 402A, that [special] responsibility was placed on those who, through manufacturing and distribution, intend that products 'reach the market.' " *Francioni,* 472 Pa. at 367, 372 A.2d at 738. There can be little debate that Equitable, through manufacturing and distribution, intended that its natural gas product "reach the market." Indeed, the natural gas which is alleged to have escaped from Equitable's service line was literally within the pipeline, and inexorably and irretrievably[4] on its way

---

4. Equitable properly advised this court at argument on Equitable's motion for reconsideration that, technically, there exists no evidence of record that the gas could not be retrieved by simply reversing the pressure in the pipeline. While the possibility of Equitable's ability to retrieve the gas is accepted as true, this, at best, remote possibility

to Equitable's customer. It simply cannot be plausibly argued that the natural gas was not intended to "reach the market," or otherwise not in the "stream of commerce."

Because this court's determination, in the paragraph above appears, on its face, to be at odds with the decision in *Schriner,* a closer review and analysis of the *Schriner* decision is warranted. The authorities relied upon by the *Schriner* court strongly suggest that *Schriner*'s determination that "stray voltage" is not a product placed into the "stream of commerce" may be based upon the peculiar nature of "stray electricity" which is not similarly at issue with the natural gas in the instant case. *Schriner* stated:

"We emphasize that our holding is limited to cases where the electricity is actually in the 'stream of commerce,' *and expected to be at marketable voltage.*" *Schriner,* 348 Pa. Super. at 188, 501 A.2d at 1133, quoting *Pierce.* (emphasis added)

In the instant matter, the alleged defect asserted to exist in Equitable's gas product was that the gas was inadequately odorized. Adequate odorization is required so that the gas may be detected if a leak occurs. In this regard, the alleged defect, inadequate odorization, was a condition of the product that allegedly existed in the product whether it reached the consumer through the customer's meter or by way of a leak in the distribution system before the customer's meter.

---

does not materially affect this court's analysis on the question of whether the gas had been placed into the stream of commerce when Equitable placed it into its distribution system.

The natural gas that escaped from Equitable's pipe-lines is materially different from the electricity that escaped from the power company's electrical lines in *Schriner.* The court's holding in *Schriner* was, in material part, based upon the fact that the "stray electricity" released from the power lines was, by very function of its inadvertent release from the power lines, not at a marketable voltage. Although not explicitly stated, the *Schriner* decision appears, to this court, to have been predicated upon the fact that the alleged "defect" in the electricity existed, not as a function of an inherent "defect" in the tangible product itself, but, rather, as a function of the electric company's failure to distribute it at a marketable voltage (*i.e.,* in a controlled fashion through the service box of the customer).

In the instant matter, the alleged defect is inherently within the tangible product itself—it is inadequately odorized—whether discharged before or after the customer's meter. Significantly, the gas in this case reaches the consumer (albeit by an irregular, and unintended, route, but) in substantially the same condition as it would have reached the consumer if delivered through the customer's meter.

More importantly, when applying the *Francioni* four-prong analysis to Equitable and its natural gas in this case, this court finds that the test is met. Application of the first three elements clearly support a finding that Equitable is a supplier for purposes of 402A liability. Initially more problematic to this court was the question of whether the fourth prong of the *Francioni* test is satisfied. That prong requires consideration of whether the supplier can distribute the cost of compensating for in-

juries resulting from defects by charging for it in his business. This court questions whether Equitable, as a public utility company that does not maintain complete control over determining costs of its product, can be said to be adequately able to distribute the costs of compensating for injuries resulting from defects by charging for it in its business. Interestingly, the *Schriner* decision placates this court's concerns to some degree. *Schriner* states:

"The inquiry regarding public policy is for the court ... and the factors relevant to the inquiry support the application of strict liability to a utility company supplying electricity as a product. . . . But see Comment, *Torts of Electric Utilities: Can Strict Liability Be Plugged In?*, 11 Loyola L.A.L.Rev. 775 (1978)." *Schriner,* 348 Pa. Super. at 189-90, 501 A.2d at 1134. (citations omitted)

Relying upon the above cited language, this court concludes that the *Schriner* court considered the question of whether it was appropriate to impose 402A strict liability upon a public utility company and resolved that question in the affirmative.

At argument on Equitable's motion for reconsideration and within Equitable's brief in support of motion for reconsideration, counsel for Equitable clarified Equitable's position that while a "sale" is not required, a "commercial transfer" event is required for 402A liability to attach. In support of this proposition Equitable cites to several cases: *Stecyk v. Bell Helicopter Textron Inc.,* 1996 WL 153555 (E.D. Pa. 1996); *Woods v. Luertzing Corp.,* 167 N.J. Super. 156, 400 A.2d 562 (App. Div. 1979); *Ettinger v. Triangle-Pacific Corp.,* 799 A.2d 95

(Pa. Super. 2002); and *Armstrong Rubber Co. v. Urquidez,* 570 S.W.2d 374 (Tex. 1978). Each of these cases may be fairly distinguished from the instant matter.

*Stecyk* involved claims arising from the crash of an experimental aircraft. The aircraft involved was not yet fully developed for use by the consuming public. The *Stecyk* court held:

"I conclude that strict liability does not apply to experimental, developing products still in the process of being tested." *Stecyk,* 1996 WL 153555, p. 7.

The gas involved in the instant matter was in no manner "experimental." It was fully developed, and, in all material respects, it was in precisely the same condition as it would have been if it had reached the consumer through the customer's meter.

Similarly, *Woods,* a 1979 New Jersey Superior Court decision, involved an accident that occurred while operating a "Glass Cantainer" machine prototype that was still under development. The *Woods* court stated:

"The only 'Glass Cantainer' in existence is that involved in this case. Hoping that the softer glass used in plaintiff's [shop] would solve the problems with the machine, defendant contracted with plaintiff to aid in the further development of the machine. . . .

"From the deposition excerpts filed, it is clear that plaintiff knew that the machine was still being developed." *Woods,* 400 A.2d at 564.

"Plaintiff, here, was not the target of a sales effort but was expressly hired to aid in the development of the machine. This fact raises policy considerations countervailing those that seemingly support strict or warranty liability in this case. . . .

"A further reason for not imposing liability for breach of the implied warranty of fitness for a particular purpose under [New Jersey's state warranty law] is that, in this case and in all cases where goods are supplied to an individual or corporation for the purpose of discovering the capabilities and shortcomings of the thing being supplied, that is the essence of the transaction. The supplier does not know enough about his product to market it; hence he engages someone to help him find out, paying that person for his services and facilities. Plaintiff's purpose here was to earn the money promised for aiding in the development of defendant's product; he clearly had no purpose of his own for the use of the 'Glass Cantainer' independent of defendant's testing purpose. . . .

"[T]he postulate of strict liability cannot apply to this case in which plaintiff was not the buyer, lessor, or ultimate user as recipient from buyer or lessor, but was specifically hired to test the product supplied, which product had never been sold or leased." *Woods,* 400 A.2d at 566-67.[5]

*Ettinger* involved a claim arising from an injury suffered by an electrician at a furniture manufacturing plant. The electrician was running electrical conduit along the outside of, and to the motors of, a large oven. In point of fact, the oven was a two-story enclosed oven system with

5. Equitable's brief in support of motion for reconsideration bolsters the significance of the *Woods* decision by noting that both *Stecyk* (U.S. Dist. Ct., E.D. Pa. 1996) and *Ettinger* (Pa. Super. 2002), *supra,* rely upon the reasoning of *Woods.* This court notes that *Stecyk* and *Ettinger's* reliance upon *Woods* is limited to the proposition that 402A liability could not be imposed where the allegedly defective product was "still being developed" or the injury occurred "during experiments involving [a] . . . machine still in development . . . ." 799 A.2d at 103.

a conveyor system designed to dry large wood cabinetry after it had been coated with finish. Importantly, the oven was still being assembled by the defendant at the time of the electrician's injury. In the instant matter, there is no similar "unassembled" product involved. The gas at issue in this case was a product in its final form.

In *Armstrong,* a 1978 Texas court decision, plaintiff alleged that a defect caused a tire blowout resulting in the accident injuring the plaintiff. The allegedly defective tire, a so-called "non-interest spare" blew out at a testing facility during the testing and development of another undeveloped tire on the same vehicle. The allegedly defective "non-interest spare" tire "was manufactured and provided for use only as a non-interest spare on [the testing facility's test] trucks." *Armstrong,* 570 S.W.2d at 375. As such, the product in *Armstrong* was never manufactured for purposes of reaching the consuming public. The same cannot be said of the gas in this case. The gas in this case was clearly manufactured for use by the consuming public.

This court is satisfied that, even to the extent the authorities cited by Equitable may be controlling or persuasive authorities as to the issues before this court, the authorities cited do not support the assertion by Equitable that some *specific* "commercial transfer" event (that did not occur in this case) must occur before Equitable's gas may be deemed to have been placed into the stream of commerce.

Accordingly, having determined that Equitable placed its gas "into the stream of commerce," having found that the four prongs of the *Francioni* test have been established, and having found no authority to support the proposition that a "sale," "delivery" or other *specific*

"commercial transfer" event must be consummated before 402A liability may be imposed upon a supplier, this court concludes that Equitable was a supplier of a product (natural gas) which has been adequately alleged to have been in a defective condition unreasonably dangerous (by virtue of its inadequate odorization), which product was expected to and did reach the user or consumer (albeit by an irregular and unintended route) without substantial change in the condition in which it was supplied by Equitable.

For the above reasons, the preliminary objection of the Equitable defendants to the plaintiffs' 402A claims are overruled. As indicated in this court's order of this date, this court's determination involves a controlling question of law as to which there is substantial ground for difference of opinion, and an immediate appeal from this court's order may materially advance the ultimate termination of the matter.

The preliminary objections of the Equitable defendants to the plaintiffs' warranty claims are overruled. See *Gardiner v. Philadelphia Gas Works,* 413 Pa. 415, 197 A.2d 612 (1964).

## ORDER

And now, September 23, 2005, following argument on Equitable's motion for reconsideration, and for the reasons set forth in this court's second amended opinion of this date, the preliminary objection of the Equitable defendants to the plaintiffs' 402A claims are overruled. This court's determination involves a controlling question of law as to which there is substantial ground for difference of opinion and an immediate appeal from this

court's order may materially advance the ultimate termination of the matter. 42 Pa.C.S. 702(b).

The preliminary objections of the Equitable defendants to the plaintiffs' warranty claims are overruled. See *Gardiner v. Philadelphia Gas Works,* 413 Pa. 415, 197 A.2d 612 (1964).