Genevieve **LUKOWSKI, Individually and as Administratrix of the Estate of Sigmund C. Lukowski, Deceased, Plaintiff-Appellant,**

v.

**VECTA EDUCATIONAL CORPORATION and James M. Turner, d/b/a James M. Turner & Associates, Inc., Defendants-Appellees.**

No. 3–378A55.

Court of Appeals of Indiana, Third District.

March 27, 1980.

Frank J. Galvin, Jr., Galvin & Galvin, Hammond, for plaintiff-appellant.

John M. Kappas, Merrillville, Marlatt & Kappos, Richard A. Mayer, Spangler, Jennings, Spangler & Dougherty, Gary, for defendants-appellees.

GARRARD, Presiding Judge.

Suit was initiated by the appellant, Genevieve Lukowski, individually and as administratrix of her deceased husband's estate seeking damages for personal injuries suffered when her husband fell from the top of the balcony bleachers in the Hammond High School gymnasium during the course of a basketball game on November 24, 1972.[1] Named as defendants were the School City of Hammond, Vecta Educational Corporation, and James M. Turner, d/b/a James M. Turner and Associates, Inc. The School City operated Hammond High School and maintained its facilities. Vecta had contracted with the School City to perform some work for the renovation of the high school, including the manufacture and installation of bleachers for the gymnasium. Turner was the architect for the project. At the time of the incident, the top row of the balcony bleachers contained no back railing. It was this deficiency that formed the basis of Mrs. Lukowski's claims. All three defendants were charged with negligence. In addition, relief against Vecta was predicated on strict liability in tort.

The two claims were venued and finally consolidated for trial in the Pulaski Circuit Court. The actions against the School City of Hammond were voluntarily dismissed after a settlement was reached. A jury trial commenced with the remaining defendants on September 12, 1977. After the plaintiff

---

1. The parties stipulated in the pre-trial order that the husband's alleged injuries resulting from the accident did not cause his death and that Mrs. Lukowski was not claiming any damages for wrongful death.

had presented her case and rested, Vecta and Turner moved for judgment on the evidence pursuant to Indiana Rules of Procedure, Trial Rule 50. The trial court granted Turner's motion and entered judgment thereon. Vecta's motion was granted on the strict liability claim but was submitted to the jury on the negligence claim. The jury returned a verdict in favor of Vecta and judgment was entered accordingly. After the denial of her motion to correct errors, Mrs. Lukowski timely perfected an appeal to this court. She does not challenge the jury verdict on the negligence count against Vecta. She does appeal the granting of the Trial Rule 50 motions. She contends that sufficient evidence was introduced to avoid judgments on the evidence.

■ With respect to the appropriate standard of review, this court has observed,

Indiana cases dealing with judgment on the evidence are consistent in the results reached. However, the language employed in articulating the standard of review is somewhat confusing and apparently inconsistent. *Compare, e. g.,* the Court of Appeals and Supreme Court opinions in *Miller v. Griesel* (1973), Ind. App., 297 N.E.2d 463, *transferred* (1974), 261 Ind. 604, 308 N.E.2d 701, with those in *Mamula v. Ford Motor Co.* (1971), 150 Ind.App. 179, 275 N.E.2d 849; and *Vernon Fire & Cas. Ins. Co. v. Sharp* (1976), Ind., 349 N.E.2d 173.

What the cases clearly suggest, however, is that the court is not free to indulge in the fact finder's function of weighing the evidence and resolving credibility determinations to grant a judgment on the evidence. On the other hand, unless there is some evidence of probative value (i. e., carrying the quality of proof and having fitness to induce conviction) upon each element of the claim, the motion is properly granted.

Evidence, of course, is direct or circumstantial. There is normally little difficulty in determining whether direct evidence of probative value has been adduced upon an issue. The problem arises in the area of circumstantial evidence. If the ultimate fact in question exists as a reasonable inference from the circumstantial evidence, a TR 50 motion should be denied. Conversely, if the circumstantial evidence fails to create a reasonable inference of the ultimate fact, but merely leaves the possibility of its existence open for surmise, conjecture or speculation, then there is no evidence of probative value as to that ultimate fact, and the motion may be granted. As Judge Buchanan stated in *Mamula*, the trick is to tell the difference, and the answer depends upon the facts and circumstances of a given case.

*McKeown v. Calusa* (1977), Ind.App., 359 N.E.2d 550, 552–53 (footnote omitted). Thus, a Trial Rule 50 judgment for a defendant is proper only where the plaintiff has failed to present some evidence of probative value on one or more of the essential elements of his claim. *Accord, Walters v. Kellam & Foley* (1977), Ind.App., 360 N.E.2d 199.

Mrs. Lukowski's assertion of negligence against Turner relies upon two claims. First, she contends that Turner negligently failed to supervise the construction of the gymnasium bleachers by Vecta, specifically that he failed to require conformance with the shop drawings which called for the placement of guardrails at the top of the balcony seats. The testimony disclosed that two days before the accident, Turner visited the worksite and was assured by the superintendent on the job that everything would be ready by game time. Turner did not go back to the gymnasium the day of the game. It is Mrs. Lukowski's contention that Turner should have returned to make sure that the railings were placed in their proper position and that, had he done so and noticed their absence, he could have stopped the balcony bleachers from being used. In granting Turner's motion for judgment on the evidence, the trial court specifically alluded to a lack of negligent causation. However, it is not clear whether the court based its decision on a lack of duty owing from Turner to Mrs. Lukowski's husband or whether such a duty was assumed but no evidence was presented to show its breach.

A similar question was presented in *Walters v. Kellam & Foley* (1977), Ind.App., 360 N.E.2d 199. There, the plaintiff, a sheet metal worker on a construction project, was injured while installing certain duct material above a heating and ventilating unit in a gymnasium. During the course of his work, he dropped a tool into the unit below which he attempted to retrieve by lowering himself into the unit and placing his feet on the bottom panel. The panel broke loose, and plaintiff fell approximately thirty feet. His suit charged that the architect was negligent for, among other things, failing to properly supervise the work. Specifically, the architect allegedly failed to inspect the unit and reject it for safety reasons and failed to warn the plaintiff of the latent dangers existing in that unit.

In determining the propriety of a Trial Rule 50 judgment for the architect, Judge Sullivan recognized that the initial question was whether a duty was owed to the plaintiff and that it was ordinarily a question of law for the court to ascertain if there was a legal relationship between the parties that would give rise to such a duty. *See also Miller v. Griesel* (1974), 261 Ind. 604, 308 N.E.2d 701. With regard to an architect's duty to supervise, he noted,

> To appropriately define the duty to supervise, the obligation to assure that construction conforms to the authorized plans is to be distinguished from the obligation to assume responsibility for the safety of persons lawfully on the construction site. *See Walker v. Wittenberg, Delony & Davidson, Inc., supra,* [241 Ark. 525, 412 S.W.2d 621] at 630; *Parks v. Atkinson* (1973), 19 Ariz.App. 111, 505 P.2d 279, 283; *Miller v. DeWitt* (1976), 37 Ill.2d 273, 226 N.E.2d 630, 638; 59 A.L.R.2d 869; *Restatement 2d, Torts,* § 414, Comments a & c; *see generally Jones v. Indianapolis Power & Light Co.* (2d Dist. 1973), 158 Ind.App. 676, 304 N.E.2d 337, 343; *Bruemmer v. Clark Equipment Co.* (1965), 7th Cir., 341 F.2d 23, 25; *Farmers State Bank of Valparaiso v. Dravo Corp.* (1963), 7th Cir., 321 F.2d 38, 41.

360 N.E.2d at 207. After examining the architect's on-site conduct and the contractual provisions governing his responsibilities, which are similar to the contractual provisions in the case at bar, Judge Sullivan concluded that the evidence was insufficient to establish a duty to supervise day-to-day work methods so as to maintain the safety of the workman. We reach the same conclusion concerning plaintiff's decedent.

Although the contract between the School City and Turner is not set forth in the record, Turner testified that his contract did not require him to have someone on the jobsite continuously and that his supervisory presence was required only occasionally and as the need arose. He testified that his responsibility was to prepare plans and specifications and to generally observe the construction as it progressed for the purpose of seeing that the work conformed with those plans and specifications. Weekly meetings were held with the School City and contractors to discuss the progress and any problems. These meetings were discontinued about a month before the incident because "the job was about done."

In addition, the record does contain the contract between the School City and Vecta. Part of that contract includes a document entitled "General Conditions of the Contract for Construction." The duties of the architect are specifically detailed therein. The architect was to "make periodic visits to the site to familiarize himself generally with the progress and quality of the Work and to determine in general if the Work [was] proceeding in accordance with the Contract Documents." However, he was not "required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work." In addition, he was not "responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work," nor was he "responsible for the Contractor's failure to carry out the Work in accordance with the Contract Documents." Instead, the contractor was to "supervise and direct the Work" and it was "solely responsible for all construction means, methods, techniques,

sequences and procedures and for coordinating all portions of the Work under the Contract." It was up to the contractor to employ a competent superintendent and assistants who would be present at the jobsite during the course of the work.

The architect's responsibilities also encompassed interpreting the contract documents and resolving any claims or disputes that might arise between the owner and contractor with respect to the execution or progress of the construction. Turner was to determine the date of substantial completion and final completion and to issue a final Certificate of Payment. He specifically was excluded from responsibility for the acts or omissions of any contractor, subcontractor or anyone else performing work on the project.

In *Walters, supra,* the court quoted approvingly from *Day v. National United States Radiator Corp.* (1961), 241 La. 288, 304–05, 128 So.2d 660, 666 which we think has application here,

As we view the matter, the primary object of this provision was to impose the duty or obligation on the architects to insure to the owner that before final acceptance of the work the building would be completed in accordance with the plans and specifications; and to insure this result the architects were to make 'frequent visits to the work site' during the progress of the work. Under the contract they as architects had no duty to supervise the contractor's method of doing the work. In fact, as architects they had no power or control over the contractor's method of performing his contract, unless such power was provided for in the specifications. Their duty to the owner was to see that before final acceptance of the work the plans and specifications had been complied with, that proper materials had been used, and generally that the owner secured the building it had contracted for.

360 N.E.2d at 210–11.

Turner admitted that the balcony bleachers were not finished the night of the game but that, as was true in other areas of the construction project, the school could use incomplete items in the exercise of an owner's discretion. If they did so, Turner stated that they would be responsible for the safety of the public. Turner also testified that he did not certify final completion of the gymnasium until June 13, 1973, over six months after the accident.

It is apparent from the evidence and testimony that Turner did not assume responsibility for the safety of Mrs. Lukowski's husband either through his conduct or by virtue of the various contract provisions. Rather, his primary task with respect to supervision was to make sure that the owner received a structure complying with the appropriate plans and specifications at the time the project was completed. If the School City wanted to use the bleachers before they were finished, that was its decision. Mrs. Lukowski failed to introduce evidence of probative value showing a duty on Turner's part.

The second aspect of plaintiff's negligence claim against Turner concerns his alleged failure to design adequate lighting at the top of the balcony bleachers. The only evidence introduced by plaintiff on this contention was the testimony of Kenneth Williams, Mr. Lukowski's companion on the night of the incident, who said that "[i]t was very dark" and that "[t]he lighting [was] atrocious." In addition, plaintiff points to Turner's own testimony that the opening through which Mr. Lukowski fell between the top bleacher and the back wall should have appeared as a "black spot" in contrast to the light wall and white ceiling. There is no contention that the lighting was unfinished or incomplete in any way on the night of the accident. Arguably, then, Turner owed the decedent a duty to exercise reasonable care, that is, to prepare plans and specifications for the lighting with the degree of competence ordinarily exercised in like circumstances by reputable members of the profession. *See Walters v. Kellam & Foley* (1977), Ind.App., 360 N.E.2d 199. However, Mrs. Lukowski's evidence totally fails on the question of whether Turner breached that duty.

First of all, plaintiff did not offer any proof that the allegedly insufficient lighting was due to faulty plans by Turner. As Turner suggests, it is possible that the school did not turn on all the lights in the balcony section of the bleachers. Secondly, the law provides that absent a special agreement, an architect does not imply or guarantee a perfect plan. 5 Am.Jur.2d *Architects* § 23 (1962); 6 C.J.S. *Architects* § 27 (1975). Rather, he will only be liable for failing to exercise the requisite standard of care. *Id.* As noted by the court in *Bayne v. Everham* (1917), 197 Mich. 181, 163 N.W. 1002,

> This court has held that the responsibility of an architect does not differ from that of a lawyer or physician. When he possesses the requisite skill and knowledge, and in the exercise thereof has used his best judgment, he has done all the law requires. The architect is not a warrantor of his plans and specifications. The result may show a mistake or defect, although he may have exercised the reasonable skill required.

*Id.* at 199–200, 163 N.W. at 1008. Mrs. Lukowski failed to introduce any evidence of probative value regarding Turner's lack of care or competence in designing the balcony lights. Judgment on the evidence was thus properly rendered in Turner's favor.

Mrs. Lukowski next contests the granting of the Trial Rule 50 judgment for Vecta on her claim of strict liability in tort. She asserts that the bleachers were defective within the meaning of § 402A of the Second Restatement of Torts in that they lacked back guardrails and failed to carry a warning to the public of the dangers attending their use.

It is undisputed that Indiana has adopted the theory of liability espoused in § 402A. *Ayr-Way Stores, Inc. v. Chitwood* (1973), 261 Ind. 86, 300 N.E.2d 335; *Ortho Pharmaceutical Corp. v. Chapman* (1979), Ind.App., 388 N.E.2d 541. That section of the Restatement provides,[2]

> Special Liability of Seller of Product for Physical Harm to User or Consumer

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

> (a) the seller is engaged in the business of selling such a product, and

> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

> (2) The rule stated in Subsection (1) applies although

> (a) the seller has exercised all possible care in the preparation and sale of his product, and

> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Indiana decisions quickly interpreted the triggering mechanism of selling a product in a defective condition to contemplate the placing of goods in commerce by one engaged in the business of selling products for use or consumption, rather than "selling" in the technical commercial sense. *Perfection Paint and Color Co. v. Konduris* (1970), 147 Ind.App. 106, 258 N.E.2d 681, 685, 686. *See also Petroski v. NIPSCO* (1976), Ind.App., 354 N.E.2d 736; *Link v. Sun Oil Co.* (1974), 160 Ind.App. 310, 312 N.E.2d 126.

Yet what is required for the imposition of strict liability is the concept of delivery, *Petroski, supra,* and that the product *then* be in an unreasonably dangerous defective condition. As the court stated in *Perfection Paint and Color Co., supra*:

> Rather, the Restatement Comments . . . refer in context to 'a special rule applicable to sellers of products' and emphasize that the rule 'extends to any product sold *in the condition, or substantially the same condition, in which it is expected to reach* the ultimate consumer.'

258 N.E.2d 685. (emphasis supplied)

The reason arises from the underlying justification for this form of strict liability.

---

2. For current statutory law relating to products liability for actions arising after June 1, 1978 see IC 33–1–1.5–1 (IC 34–4–20A–1, Burns Code Ed., 1979 Supp.).

By marketing its product for use and consumption the defendant has undertaken and assumed a special responsibility toward a foreseeable member of the consuming public who may be injured by it. 258 N.E.2d at 685.

█ The plaintiff's evidence in the case at bar failed to establish this prerequisite to liability.

According to the evidence adduced during the plaintiff's case the school corporation contracted with Vecta to furnish and install the bleachers in the new gymnasium. The bleacher capacity for the gym accommodated 2400 persons; 600 in the balcony section where plaintiff's decedent was injured. The bleachers were to be of the electronically operated telescoping variety and considerable installation work was required. The plans and specifications called for installation of a back safety railing behind the last row of bleachers and the materials for this railing were on hand. Plaintiff's decedent fell because the railing had not yet been installed on the night of the game.

Plaintiff's evidence further established, however, that the game in question, which was played on the Friday following Thanksgiving was the school's first home basketball game and the school was desirous of holding it in the new gym. On the day before Thanksgiving the bleachers were incomplete "by quite a bit" and were, in fact, not completed on the Friday of the game. The gym was not fully completed until about six months after the game. However, during this time and specifically on the day of the game the school corporation had both possession and control of the gym and power to determine whether it should be used, by whom and for what purposes. In short, the evidence failed to establish that Vecta had marketed its product in a defective condition unreasonably dangerous to the school's patrons. Rather it established that the school elected to use the product in a partially finished condition without the approval of Vecta and before Vecta had "delivered" it.[3] As such the nec-

essary premise for liability under § 402A was not supported by any evidence of probative value and the judgment was properly granted.

Affirmed.

STATON and HOFFMAN, JJ., concur.

---

3. Indeed evidence adduced later in the trial disclosed a warning to the school not to use these bleachers for the game or to, at least, block off the top five rows.