**Boyd E. ETTINGER and Esther E. Ettinger, His Wife, Appellants**

v.

**TRIANGLE–PACIFIC CORPORATION, Production Systems Incorporated, Complete Finishing Systems, Joe Green Associates, and Joe Green and Ken Pinkerton as agents, servants, and/or employees of Joe Green Associates, and individually, Appellees.**

Superior Court of Pennsylvania.

Argued June 26, 2001.
Filed May 9, 2002.

Joseph M. Melillo, Harrisburg, for appellants.

Jeffrey B. Rettig, Harrisburg, for appellee.

Before: McEWEN, P.J.E., TODD and HESTER, JJ.

TODD, J.:

¶ 1 This personal injury action arises out of an injury suffered in a fall by Appellant Boyd E. Ettinger ("Ettinger") while he was working as an electrician at a manufacturing plant that was under reconstruction. Ettinger and his wife, Esther E. Ettinger, appeal the judgment[1] in favor of

---

1. Appellants purport to appeal from the May 13, 1999 Order granting summary judgment to Triangle Pacific Corporation and partial summary judgment to Production Systems Incorporated, the June 16, 1999 Order amending the summary judgment order, and the October 23, 2000 Order denying their post-trial motions. Appeal properly lies, however, from the November 14, 2000 entry of final judgment in favor of PSI and Triangle Pacific. See *Johnston the Florist, Inc. v. TEDCO*

Appellee Production Systems Incorporated ("PSI")[2] and present a question of first impression to this Court. We are asked to determine, *inter alia,* whether an item that is being assembled by its producer is a "product" and whether one of its assemblers is a "user" under Section 402A of the Restatement (Second) of Torts. Specifically, we are asked to determine whether the trial court properly granted partial summary judgment to PSI based on its holding that the partially-assembled commercial furniture finishing oven in which Ettinger was installing wiring did not constitute a product and that Ettinger as one of its assemblers was not a user under Section 402A. For the reasons that follow, we affirm on this and the other issues presented by Appellants.

¶ 2 Ettinger was injured during the rebuilding of a kitchen cabinet manufacturing plant owned by Triangle Pacific Corporation ("Triangle–Pacific") in Thompsontown, Pennsylvania that had been destroyed in a fire. As part of the reconstruction, Triangle–Pacific contracted with PSI for the purchase of a furniture finishing system consisting of paint spraying equipment and a two-story enclosed oven with a conveyor system designed to dry wood cabinetry after it had been coated with finish. The system was to be manufactured by PSI and shipped to the Triangle–Pacific plant in sections where the steel structure would be assembled by PSI's subcontractor, Reliable Welding.

¶ 3 The contract between Triangle–Pacific and PSI required PSI to provide a competent foreman or supervisor to oversee the assembly. Because of a prior working relationship, however, Triangle Pacific desired that Joe Green Associates

oversee the installation of the system. Accordingly, Ken Pinkerton, an employee of Joe Green Associates, was assigned to be on the job site during the installation. PSI paid Joe Green Associates for Pinkerton's time spent overseeing the installation of the system and provided Pinkerton with a full set of drawings of the system. On behalf of PSI, Joe Green Associates retained Daniel Mowery and his company, Mowery Electric, to perform electrical work for the installation. Mowery received a set of blueprints and schematics for the system.

¶ 4 At the time of his injury, Ettinger, an employee of Mowery Electric and an experienced electrician, was working to run conduits along the top and side of the oven and wire all of the motors on the oven. The oven was not fully assembled and the conveyer system had not yet been installed. After completing the assembly of the outer structure, Reliable Welding left the work site in order to permit the electrical wiring to proceed. After the oven had been wired, Reliable Welding was to return to install the conveyor system.

¶ 5 On the day he was injured, Ettinger was searching for a particular motor that was to have been mounted on or inside the oven enclosure in order to attempt to wire that motor. In attempting to locate the motor, Ettinger climbed to the upper portion of the oven enclosure by ladder and entered the oven enclosure via an opening that was intended to accommodate the conveyor system. Ettinger carried a flashlight with him because he knew there was no lighting inside of the oven enclosure. Ettinger had never been inside of the oven enclosure, however, and had not examined

*Constr. Corp.,* 441 Pa.Super. 281, 287, 657 A.2d 511, 514 (1995).

2. As explained fully below, PSI is the only original defendant in this action that remains a party on appeal.

the drawings of the system to determine its interior layout. In addition, Ettinger did not inform Mowery or Pinkerton of his intention to enter the oven enclosure, nor did he discuss the interior layout of the system with anyone.

¶ 6 Upon entering the upper level of the oven enclosure, Ettinger was able to stand on a horizontal partition between the upper and lower levels. The ambient light available within the enclosure at this point was dim, but Ettinger did not use his flashlight. In his continuing effort to locate the motor, Ettinger proceeded across the horizontal partition to an opening in a vertical partition in the oven enclosure that, again, was intended to accommodate the conveyor system. As Ettinger moved across the horizontal partition, the ambient light became very dim. Due to the lack of light, Ettinger was unable to see anything on the other side of the opening in the vertical partition. Nevertheless, Ettinger crouched down and stepped through the vertical partition on the assumption that the horizontal partition on which he had been standing continued on the other side. Unfortunately, this assumption was not correct and Ettinger fell approximately eight to ten feet to the bottom of the oven enclosure. Ettinger suffered serious injuries as a result of this fall.

¶ 7 Ettinger and his wife brought suit against Triangle–Pacific, PSI, Complete Finishing Systems, Joe Green Associates, Joe Green and Ken Pinkerton alleging strict products liability, premises liability and negligence. After discovery, Triangle–Pacific moved for summary judgment, arguing that there had been no evidence adduced during discovery of negligence on its part. The trial court held that Triangle–Pacific as premises owner had no duty to protect the employees of independent contractors working on its premises from risks arising from defects or hazards created by the job. The trial court further held that Appellants had failed to prove that the "peculiar risk" exception to the general rule of premise owner non-liability should be applied in this case. Accordingly, the trial court, by order of the Honorable Jeannine Turgeon, granted Triangle–Pacific's motion for summary judgment.

¶ 8 PSI similarly moved for partial summary judgment, seeking to strike the strict products liability count. The trial court likewise granted summary judgment, holding that the unassembled oven did not constitute a "product" and that Ettinger was not a "user" under Section 402A of the Restatement (Second) of Torts.[3]

¶ 9 The case thus proceeded to trial before a jury on the negligence count against PSI alone.[4] The jury found that PSI had been negligent and that its negligence was a substantial factor in bringing about Ettinger's harm. The jury further found, however, that Ettinger was contributorily negligent and that his contributory negligence also was a substantial factor in bringing about the injury. The jury apportioned PSI's negligence at 49% and Ettinger's at 51%. The trial court, by the

3. On Appellant's motion, the trial court certified its order granting Triangle–Pacific's motion for summary judgment and PSI's motion for partial summary judgment for interlocutory appeal. This Court subsequently denied Appellants' petition for permission to bring an interlocutory appeal.

4. One week before trial, Appellants voluntarily discontinued the action as to Joe Green Associates, Joe Green, and Ken Pinkerton. The remaining named Defendant, Complete Finishing Systems, had not been an active participant in this litigation and did not take part in the trial. Appellants voluntarily discontinued this action as to Complete Finishing Systems during the pendency of the present appeal.

Honorable John F. Cherry, denied Appellants' motion for post-trial relief requesting a new trial. This timely appeal followed.

¶ 10 Appellants submit the following issues for our consideration:

A. Did the trial court err in deciding that under Pennsylvania law an unassembled item cannot be a "product" and its assembler a "user" for strict product liability purposes?

B. Did the trial court err in not charging the jury on Restatement (Second) of Torts § 323?

C. Did the trial court err in failing to charge the jury on Plaintiffs' Supplemental Points for Charge numbers 26 and 27?

D. Did the trial court err in not charging the jury according to Plaintiffs' Supplemental Points for Charge concerning the Borrowed Servant Doctrine?

E. Did the trial court err in permitting Eugene Aufiero to testify that the section of OSHA relating to "confined spaces" applied to the facts of this case?

(Appellants' Brief, at 4.)[5]

¶ 11 We will review initially the propriety of the trial court's grant of PSI's motion for partial summary judgment. Summary judgment properly is granted after the close of the relevant pleadings "whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report" and the moving party is entitled to judgment as a matter of law. Pa. R.C.P. 1035.2(1). Our scope of review of an order granting or denying a motion for summary judgment is well established:

We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.

*Pappas v. Asbel,* 564 Pa. 407, 418, 768 A.2d 1089, 1095 (2001) (citations omitted).

¶ 12 Section 402A was adopted as the law of this Commonwealth by our Supreme Court more than three decades ago in *Webb v. Zern,* 422 Pa. 424, 427, 220 A.2d 853, 854 (1966). This Section provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

---

**5.** Appellants voluntarily discontinued their appeal as to Triangle–Pacific.

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts § 402A. This Court has stated that:

When we distill § 402A into its constituent elements, we find that the following are necessary to an appropriate application of this section:

(1) a product;

(2) a sale of that product;

(3) a user or consumer;

(4) a defective condition, unreasonably dangerous; and

(5) causation—that the product caused physical harm to the ultimate user or consumer, or to his property.

If any of these requisite elements remains unsatisfied, § 402A has no applicability.

*Schriner v. Pennsylvania Power & Light Co.*, 348 Pa.Super. 177, 185, 501 A.2d 1128, 1132 (1985).

¶ 13 PSI argued successfully before the trial court on summary judgment that two requisite elements, a product and a user or consumer, had not been met in the present case. The trial court recognized, and the parties agree, that the questions of whether an item that is being assembled by its producer is a product and its assembler a user under Section 402A are questions of first impression in the appellate courts of this Commonwealth.[6]

¶ 14 The parties recognize as well that the Restatement takes no direct position on this question. Indeed, this Section of the Restatement is followed by this caveat:

The Institute expresses no opinion as to whether the rules stated in this Section may not apply

(1) to harm to persons other than users or consumers;

(2) to the seller of a product expected to be processed or otherwise substantially changed before it reaches the user or consumer; or

(3) to the seller of a component part of a product to be assembled.

Restatement (Second) of Torts § 402A Caveat. Comment d to Section 402A, however, states that this section "extends to any product sold in the condition, or substantially the same condition, in which it is expected to reach the ultimate user or consumer." Restatement (Second) of Torts § 402A, Comment d.

 ¶ 15 Appellants argue that neither an item's size, nor the fact that it is assembled in place, should be determinative of its status as a product for purposes of whether Section 402A applies. We agree. We agree as well that the fact that an item is assembled in place does not prevent it from being deemed to be a product when complete.[7] *See Abdul-War-*

6. In *Ellis v. Chicago Bridge & Iron, Co.*, 376 Pa.Super. 220, 545 A.2d 906 (1988), this Court determined that steel plates packed for shipment to their ultimate destination in bundles with a total weight in excess of 7,000 pounds were not defective due to lack of warnings, instructions or markings as to how they were to be handled. In so holding, the majority of the panel specifically declined to address whether the decedent, a dock worker who was killed when one of the bundles fell while being loaded onto a ship, was a user or consumer under Section 402A. *Id.* at 235 n. 16, 545 A.2d at 914–15 n. 16.

7. We note that this Court held in *Cox v. Shaffer*, 223 Pa.Super. 429, 302 A.2d 456 (1973), that "[a] silo constructed in place ... is not a sale of a 'product'" under Section 402A. *Id.* at 431, 302 A.2d at 457. The opinion in *Cox*, however, provided no explanation as to the reasoning underlying this holding, stating simply "[w]e find the section inapplicable by virtue of its very clear language and find no need to resort to any extended reasoning to support our determination that a building so constructed on the site is not a product within the intent and meaning of section 402A." *Id.* A subsequent decision of this Court cited *Cox*

ith v. Arthur G. McKee and Co., 488 F.Supp. 306, 311–12 (E.D.Pa.1980) ("[I]f the point of assembly were the decisive consideration, all pieces of industrial equipment too large or too cumbersome to be delivered preassembled would be excluded from section 402A."), aff'd 642 F.2d 440 (3d Cir.1981).

¶ 16 The fact that the component parts of a larger item are to be finally assembled onsite, however, does not mean that the item is complete and therefore a product for purposes of Section 402A when the component parts have left the site of their original fabrication. In the present case, it is undisputed that Triangle–Pacific contracted with PSI to provide a complete, installed system and that the system was not complete at the time of Ettinger's injury.

█ ¶ 17 In the absence of controlling precedent from the appellate courts of this Commonwealth, we may draw guidance from the analysis employed by other jurisdictions. The Court of Appeals of Indiana faced a similar factual situation in Lukowski v. Vecta Educational Corp., 401 N.E.2d 781 (Ind.Ct.App.1980). In that case, the appellee, Vecta Educational Corporation, had contracted to perform work in conjunction with the renovation of a high school. Included in Vecta's obligations was the manufacture and installation of bleachers for a gymnasium. The school opted to use the bleachers to accommodate spectators at a basketball game before the bleachers had been completed. Among the tasks yet to be done was the installation of the back guardrails. One of the spectators died after falling backwards

from the top of the bleachers and his widow brought suit, inter alia, against the manufacturer under Section 402A. The Court of Appeals affirmed the trial court's ruling that Vecta was not liable because at the time of the injury, the bleachers had not been delivered in their completed form and were not yet intended to be utilized by the ultimate users or consumers. Id. at 787.

¶ 18 Appellate courts in other jurisdictions have reached the same conclusion. See also Bosse v. Litton Unit Handling Sys., 646 F.2d 689, 694 (1st Cir.1981) (Worker injured during assembly of catwalk in bottling plant could not recover under Section 402A; "plaintiff was injured in the course of putting the catwalk into final shape. In these circumstances, he is limited to his action for negligence."); Woods v. Luertzing Corp., 167 N.J.Super. 156, 400 A.2d 562 (App.Div.1979) (person injured during experiments involving patented machine still in development could not recover under Section 402A); Scott v. Thunderbird Indus., Inc., 651 P.2d 1346, 1348 (Okla.Ct.App.1982) ("An injured employee participating in the fabrication of a product is not within that class of persons who are under the umbrella of protection afforded by [402A].").

¶ 19 The Appellate Court of Illinois addressed this issue in Maddan v. R.A. Cullinan & Son, Inc., 88 Ill.App.3d 1029, 44 Ill.Dec. 233, 411 N.E.2d 139 (1980). The court in Maddan ultimately concluded that a guardrail, whether finished or unfinished, was not a product under Section 402A, because it was not in the stream of

in a footnote as support for the statement that "there exists case law in Pennsylvania which suggests that a building is not a 'product' for § 402A purposes." Lupinski v. Heritage Homes, Ltd., 369 Pa.Super. 488, 493 n. 3, 535 A.2d 656, 658 n. 3 (1988). Thus, despite its language regarding assembly in place, given

the lack of analysis in the opinion itself and its subsequent characterization as applying to buildings, Cox provides no guidance for the case at hand. Accordingly, we regard the instant case as presenting a question of first impression.

commerce. In reaching this conclusion, however, the court analyzed whether a partially constructed guardrail could be deemed to be a product under Section 402A. The Illinois court reasoned that:

> Assuming arguendo that the guardrail was a product which was unreasonably dangerous, it had not left the manufacturer's control. The guardrail was only partially constructed; it had not been accepted or approved of by the State. In short, it had not been placed in the stream of commerce. The plaintiff is asking that this court extend the doctrine of products liability to unfinished or partially constructed structures. To agree with the plaintiff would require that a manufacturer or builder would from the onset of his efforts have to at all times have "absolute end product" safety features in the product being manufactured or the structure being built.

*Id.* at 140.

¶ 20 In contrast, Appellants direct our attention to a number of cases where courts in other jurisdictions permitted recovery to individuals injured during the on-site assembly of an item because it was deemed to be a product and the injured parties were deemed to be users under Section 402A. *See Lantis v. Astec Indus., Inc.,* 648 F.2d 1118 (7th Cir.1981) (prefabricated asphalt mixing plant was a product under Section 402A); *Kaneko v. Hilo Coast Processing,* 65 Haw. 447, 654 P.2d 343 (1982) (prefabricated building was a product under Section 402A); *Varilek v. Mitchell Engineering Co.,* 200 Ill.App.3d 649, 146 Ill.Dec. 402, 558 N.E.2d 365 (1990) (same).

¶ 21 In each of these cases, however, the item in question in its completed form was in the nature of a kit, at all times intended to be assembled by the purchaser or those acting on the purchaser's behalf. More-

over, the key to the determination that the item in question was a finished product was the intent of the parties that the product was complete when delivered in its unassembled form. Indeed, as the United States Court of Appeals stated in *Lantis,* regarding *Lukowski, supra,* "it is plain that the key factor [in *Lukowski* ] was not that the bleachers were unassembled at the time plaintiff's spouse was injured but that the sales contract did not contemplate the sale of unassembled bleachers." *Lantis,* 648 F.2d at 1121. The circuit court concluded in *Lantis* that the asphalt plant was a product when delivered to the purchaser in its component form because the purchaser was responsible for the assembly of the asphalt plant, despite the fact that the manufacturer was to provide a supervisor for the process.

¶ 22 In the present case, however, the record is clear that PSI, the manufacturer, not Triangle Pacific, the purchaser, was responsible for the assembly and installation of the oven. Appellants argue that the fact that the oven was not completely assembled is not the determinative factor because:

> Under principles of strict liability, a product must be judged defective at the time it left the seller's possession. It is [Appellants'] theory that the actionable defect was the failure of the unassembled product, once delivered to its final destination, to include adequate instructions and warnings about assembly, including the dangers posed to the different contractors necessarily involved in its final installation.

(Appellants' Brief, at 17.) We disagree. Although the component parts of the oven had left PSI's manufacturing plant and were being assembled on Triangle Pacific's property, they had not left the seller's possession, as PSI indisputably retained the obligation to assemble the component

parts and deliver a fully-assembled oven. Moreover, the alleged defect, the lack of adequate warnings and instructions regarding assembly of the oven, by its very nature would not be present in a fully-assembled oven.[8]

¶ 23 While as in the present case, the injuries in *Lantis, Kaneko,* and *Varilek,* did occur during the assembly of the products, the injured parties in those cases all were acting on behalf of the purchaser of the prefabricated unit when they were injured. In contrast, in the present case, the record is clear that Ettinger, as the employee of one of PSI's subcontractors, was acting on behalf of the manufacturer, PSI, and not on behalf of the purchaser, Triangle–Pacific. Thus, the facts of this case are distinguishable from those of the cases relied upon by Appellants.

■ ¶ 24 In sum, we agree with the conclusion reached by those jurisdictions that have held that Section 402A does not apply to an incomplete product that has not left the control of its manufacturer and thus entered the stream of commerce. Such result is consistent with prior precedent applying Section 402A and the public policies underlying the adoption of this section, as articulated by the appellate courts of this Commonwealth. *See Davis v. Berwind Corp.,* 547 Pa. 260, 266, 690 A.2d 186, 189–90 (1997) ("Section 402A reflects the social policy that a seller or manufacturer is best able to shoulder the costs and to administer the risks involved when a product is released into the stream of commerce."); *Azzarello v. Black Bros. Co.,* 480 Pa. 547, 559, 391 A.2d 1020, 1027 (1978) ("Under [402A] ... the jury may find a defect where the product left the supplier's control lacking any element nec-

essary to make it safe for its intended use ...."); *Schriner,* 348 Pa.Super. at 189, 501 A.2d at 1134 ("electricity only becomes a product, for purposes of strict liability, once it passes through the customer's meter and into the stream of commerce"); *Hoffman v. Loos & Dilworth, Inc.,* 307 Pa.Super. 131, 142, 452 A.2d 1349, 1355 ("What is crucial to the rule of strict liability is not the means of marketing, but rather the fact of marketing, whether by sale, lease or bailment, for use and consumption by the public.").

¶ 25 We hold, therefore, that the trial court correctly determined that the oven in the present case was not a product under Section 402A. Having reached this result, we need not address Appellants' argument that Ettinger was a user or consumer for purposes of application of that section, as failure to satisfy any of the elements set forth in *Schriner, supra,* precludes application of Section 402A. Accordingly, we affirm the trial court's grant of summary judgment in favor of PSI on Appellants' strict liability claim.

¶ 26 We now turn to the propriety of the trial court's denial of Appellants' post-trial motions seeking a new trial. In *Harman v. Borah,* 562 Pa. 455, 756 A.2d 1116 (2000), the Supreme Court of Pennsylvania reexamined the appropriate review of a motion for a new trial at both the trial court and appellate levels. The Court cautioned in *Harman* that "[a]lthough all new trial orders are subject to appellate review, it is well-established law that, absent a clear abuse of discretion by the trial court, appellate courts must not interfere with the trial court's authority to grant or deny a new trial." *Id.* at 466, 756 A.2d at 1121–22.

---

8. Thus, the present case is distinguishable from cases in which an allegedly defective component, such as a bolt, valve or switch, later installed in a larger product, causes inju-

ry. Similarly, this is not a situation in which an incomplete product is put into the stream of commerce as though complete.

¶ 27 In *Harman,* the Court noted that the trial court must follow a two-step process in responding to a request for a new trial. The trial court must determine whether a factual, legal or discretionary mistake was made at trial. *Id.* at 467, 756 A.2d at 1122. If the trial court determines that one or more mistakes were made, it must then evaluate whether the mistake provided a sufficient basis for granting a new trial. *Id.* Moreover, the Court noted that "[a] new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake." *Id.* (citations omitted).

¶ 28 The Court then set forth an additional two-step analysis for appellate review of a trial court's determination to grant or deny [9] a new trial. First, the appellate court must examine the decision of the trial court to determine whether it agrees that a mistake was, or was not, made. *Id.* In so doing, the Court noted that the appellate court must apply the appropriate standard of review. If the alleged mistake involved an error of law, the appellate court must scrutinize for legal error. *Id.* at 468, 756 A.2d at 1123. If the alleged mistake at trial involved a discretionary act, the appellate court must review for an abuse of discretion. *Id.* The Court reiterated that a trial court abuses its discretion by rendering a judgment that is manifestly unreasonable, arbitrary or capricious, or has failed to apply the law, or was motivated by partiality, prejudice, bias or ill will. *Id.* at 469, 756 A.2d at 1123 (citations omitted).

¶ 29 If the appellate court agrees with the trial court's determination that there were no prejudicial mistakes at trial, then a decision by the trial court to deny a new trial must stand and we need not reach the second prong of the analysis. If the appellate court discerns that a mistake was made at trial, however, it must analyze whether the trial court abused its discretion in ruling on the motion for a new trial. *Id.* at 468, 756 A.2d at 1123.

¶ 30 In the present case, the trial court reviewed Appellants' allegations of error and determined that no error had occurred. On appeal, therefore, this Court must examine the specific allegations of error by the trial court to determine whether indeed the trial court made any mistakes. If we determine that it erred, we must then determine whether the trial court abused its discretion in denying the motion for a new trial.

¶ 31 Three of the issues raised by Appellants in their post-trial motion for a new trial, and on appeal before this Court, question the propriety of the trial court's instructions to the jury. We review challenges to the jury instructions "to determine if the trial court abused its discretion or committed an error of law. We will not grant a new trial because of an erroneous jury instruction unless the jury charge in its entirety was unclear, inadequate, or tended to mislead or confuse the jury." *Fragale v. Brigham,* 741 A.2d 788, 790 (Pa.Super.1999), *appeal denied,* 563 Pa. 629, 758 A.2d 662 (2000).

¶ 32 In reviewing a trial court's charge to the jury, an appellate court must not take the challenged words or passage out of context of the whole charge, but must look at the charge in its entirety. *Jeter v. Owens–Corning Fiberglas Corp.,* 716 A.2d 633, 635 (Pa.Super.1998). We have said that a "trial judge has wide

---

**9.** The Court specifically held that a review of a denial of a new trial requires the same analysis as a review of a grant of a new trial. *Id.* at 467, 756 A.2d at 1122.

latitude in his or her choice of language when charging a jury, provided always that the court fully and adequately conveys the applicable law." *Wagner v. Anzon,* 453 Pa.Super. 619, 634, 684 A.2d 570, 577 (1996).

■■■ ¶ 33 Appellants argue that the trial court erred in failing to charge the jury on Section 323 of the Restatement (Second) of Torts—Negligent Performance of an Undertaking to Render Services. This Section provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts, § 323. In *Hamil v. Bashline,* 481 Pa. 256, 392 A.2d 1280 (1978), our Supreme Court noted that:

> Section 323(a) recognizes that a particular class of tort actions ... differs from those cases normally sounding in tort. Whereas typically a plaintiff alleges that a defendant's act or omission set in motion a force which resulted in harm, the theory of [a case under Section 323] is that the defendant's act or omission failed in a duty to protect against harm from another source.

*Id.* at 269, 392 A.2d at 1286.

■■■ ¶ 34 Appellants acknowledge that "PSI did not directly create the hazard which ultimately hurt Mr. Ettinger." (Appellants' Brief, at 22.) They argue, however, that "because PSI assumed an obligation for the safety of subsequent contractors, the Court should have instructed that ... PSI could be found causally responsible if its failure to protect Mr. Ettinger increased the risk of his harm." (*Id.*) Appellants set forth in their brief a list of actions that they aver "PSI could and should have" taken to prevent Ettinger's injury. (Appellants' Brief, at 21–22.) In nearly every tort case that comes before this Court, it is possible with the clarity of retrospection to articulate any number of actions that might have prevented an unfortunate result. Absent a duty, however, the ability to identify such possible preventative measures in hindsight is not sufficient to recover in tort if they were not done.

¶ 35 In Pennsylvania, it is "established law that a contractor is not liable for injuries resulting from work entrusted to a subcontractor." *Leonard v. Pennsylvania Dept. of Transp.,* 565 Pa. 101, 105, 771 A.2d 1238, 1240 (2001), *reargument denied* July 17, 2001. Although Appellants state in their brief that "PSI assumed an obligation for the safety of subsequent contractors" (Appellants' Brief at 22), they do not draw our attention to any portion of the record that supports this assertion and our careful review of the record reveals no such assumption of this obligation. Indeed, the record reveals only that PSI hired Mowery Electric, an independent contractor, to perform electrical work necessary for the installation of the oven at the Triangle–Pacific site. The trial court held that:

> The doctrine of increased risk of harm is inapplicable absent the undertaking of a service either gratuitously or for consideration. [Appellants'] allegations of negligence did not assert that PSI undertook to "render services" to Mr. Ettinger, therefore a charge on increased risk of harm was not appropriate. Addi-

tionally, the doctrine presupposes an outside injury or source of negligence not concurrent with any alleged negligence by a defendant. The present case involves only one injury resulting from the combination of several parties' negligence and an instruction on an increased risk of harm theory therefore was inappropriate.

(Trial Court Opinion, 10/23/00, at 11.) We discern no abuse of discretion in the trial court's ruling. Indeed, the present case is the "typical" negligence case described by our Supreme Court in *Hamil, supra.* Accordingly, we hold the trial court did not err in failing to charge the jury on Section 323 of. the Restatement (Second) of Torts—Negligent Performance of an Undertaking to Render Services, or in denying Appellants' request for a new trial on that basis.

¶ 36 Appellants also argue that the trial court erred in refusing their request to include two specific points for charge relating to agency doctrine that were derived from the Restatement (Second) of Agency, Sections 214 and 251. By these instructions, Appellants sought to impute any negligence of Ken Pinkerton, the employee of Joe Green Associates who was assigned to oversee the installation of the oven, to PSI.[10]

¶ 37 We first must note that Appellants do not cite to any appellate case in this Commonwealth that adopted Section 214 of the Restatement (Second) of Agency and our research revealed none. We further note that while our Supreme Court did cite to Section 251 of the Restatement (Second) of Agency in *Tonsic v. Wagner,* 458 Pa. 246, 253, 329 A.2d 497, 501 (1974), neither the Supreme Court nor this Court explicitly has adopted that section as the law in this Commonwealth. Thus, it is not clear that instructions pursuant to these sections are appropriate. Indeed, in *Leonard, supra,* our Supreme Court recently reaffirmed that a contractor may delegate responsibility for safety at a work site to a subcontractor. In that case, the Court noted that "a subcontractor who undertakes a task is in the best position to provide for the safe accomplishment thereof, and delegation of safety responsibility to that subcontractor does not deviate from the contractor's duty." *Leonard,* 565 Pa. at 109, 771 A.2d at 1242. We assume for the sake of argument, without so holding, that such instructions would be appropriate in a proper case.

¶ 38 We hold, however, that the trial court correctly concluded that such instructions were inappropriate under the facts of this case because "the complaint did not sufficiently allege that Mr. Pinkerton was an agent of PSI and that [Appellants] discontinued all claims against Mr. Pinkerton without suggesting that he was

---

10. The requested instructions were:

26. Liability for Physical Harm Caused by a Servant or a Non–Servant Agent. A principal is subject to liability for physical harm to the person or the tangible things of another caused by the negligence of a servant or a non-servant agent:

(a) in the performance of an act which the principal is under a duty to have performed with care.

Thus, if you find that Production Systems, Inc. was under a duty to exercise care for the safety of subcontractors and their employees, such as Mr. Ettinger, Production Systems is liable for an agent's failure to exercise due care in discharging its duty.

\* \* \*

27. Failure of Principal to Perform Non-delegable Duty. A master or other principal who is under a duty to provide protection for or to have care used to protect others or their property and who confides the performance of such duty to a servant or other person is subject to liability to such others for harm caused to them by the failure to such agent to perform the duty.

\* \* \*

(Appellants' Brief, at 23.)

an agent of PSI. Therefore, ... charging the jury on an agency theory ... would be prejudicial to [PSI]." (Trial Court Opinion, 10/23/00, at 13–14.)

¶ 39 It is well-settled that "[a] complaint must not only give notice to the defendant of the claim being asserted but it must summarize the facts essential to support the claim." *Burnside v. Abbott Laboratories*, 351 Pa.Super. 264, 277, 505 A.2d 973, 980 (1985). Moreover, "[a]t trial, the plaintiff is not entitled to insist on a jury instruction on any claim which has not been properly pleaded." *Mattia v. Sears, Roebuck & Co.*, 366 Pa.Super. 504, 509, 531 A.2d 789, 792 (1987). As to the facts necessary to plead sufficiently an agency relationship, this Court has stated that

> While it is unnecessary to plead all the various details of an alleged agency relationship, a complainant must allege, as a minimum, facts which: (1) identify the agent by name or appropriate description; and (2) set forth the agent's authority, and how the tortious acts of the agent either fall within the scope of that authority, or, if unauthorized, were ratified by the principal.

*Alumni Assoc. v. Sullivan*, 369 Pa.Super. 596, 605 n. 2, 535 A.2d 1095, 1100 n. 2 (1987), *aff'd*, 524 Pa. 356, 572 A.2d 1209 (1990).

¶ 40 On appeal, Appellants argue that the trial court erred in refusing these instructions because the complaint does include sufficient allegations of an agency relationship between Pinkerton and PSI. (*See* Appellants' Brief, at 24.) As Appellants note in their brief, Pinkerton is identified in the complaint as "an individual and/or corporation or other entity who conducted business in Thompsontown, Pennsylvania ... by providing goods and services at the Thompsontown plaint [plant] of Triangle–Pacific." (Complaint, at 2.) Appellants then argue that:

In paragraph 20 of the Complaint, [Appellants] alleged that the negligence of Triangle–Pacific, PSI, and Joe Green Associates included their failure to warn, make the premises safe, and to properly supervise for the benefit of the subcontractors. Mr. Pinkerton is not specifically named as a defendant in this paragraph, implying that he must be under the control of one of the named entities. The clear import of these allegations, considered together, is that the negligence causing [Ettinger's] harm resulted from a breach of duty owed by Triangle–Pacific, PSI, and Joe Green, but that the negligent acts, or failures to act, were committed by employees. Indeed it is axiomatic that corporations, like PSI *only* act through officers, agents, and employees. Accordingly, PSI was fully apprised of the nature of the claim [Appellants] would make, that PSI agents or employees caused harm to them.

(Appellants Brief, at 24 (emphasis original).) We disagree that these vague allegations are sufficient, even by implication, to "set forth the agent's authority, and how the tortious acts of the agent either fall within the scope of that authority, or, if unauthorized, were ratified by the principal" as required by *Alumni Assoc., supra.*

¶ 41 Moreover, it is clear in the present case, that the trial court's determination that the requested instructions were not supported by the averments of the complaint was not a hyper-technical application of pleading requirements that precluded Appellants' recovery despite facts developed during the litigation. To the contrary, Appellants did not seek to amend their complaint to include the requisite specific allegations regarding the alleged agency relationship, nor did they include such averments in their pretrial statement. Indeed, as the trial court notes in its opinion, on the eve of trial and

just two days before filing the supplemental points for charge asking for the above instruction, Appellants successfully moved to discontinue this action as to Pinkerton, Joe Green and Joe Green Associates.

¶ 42 Under these facts, we agree with the trial court that the requested instructions were not appropriate. Accordingly, we find no abuse of discretion in the trial court's refusal to instruct the jury under Sections 214 and 251 of the Restatement (Second) of Agency.

¶ 43 Appellants' third argument regarding jury instructions also deals with Pinkerton's role in Ettinger's injury and questions the trial court's refusal to give five requested points for charge relating to the borrowed servant doctrine. The trial court considered these instructions in tandem with those based on the Restatement (Second) of Agency and disallowed them for the same reason, i.e. Appellants' failure to plead an agency relationship between Pinkerton and PSI. On appeal, Appellants rely on the same reasons set forth in support of their argument regarding the instructions based on the Restatement (Second) of Agency. Again, we agree with the trial court that the requested instructions under the borrowed servant doctrine were not appropriate under the facts of the present case.

¶ 44 Appellant's final argument questions the propriety of the trial court "permitting Eugene Aufiero [11] to testify that the section of OSHA relating to 'confined spaces' applied to the facts of this case". (Appellants' Brief at 4.) PSI called Aufiero as an expert witness "to aid in the [jury's] determination of whether the oven ... qualified as a confined space under 29 C.F.R. § 1926.21(b)(6)(ii)." (Appellee's Brief, at 28.)

¶ 45 It is well established in this Commonwealth that the decision to admit or to exclude evidence, including expert testimony, lies within the sound discretion of the trial court. *Turney Media Fuel, Inc. v. Toll Bros., Inc.*, 725 A.2d 836, 839 (Pa.Super.1999). Moreover, "our standard of review is very narrow; we may only reverse upon a showing that the trial court clearly abused its discretion or committed an error of law. To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *Id.* (citation omitted.)

¶ 46 Title 29 of the OSHA regulations provides general requirements and employer responsibilities for safety training and education. In addition to the general requirements, however, this title specifically provides that "[a]ll employees required to enter into confined or enclosed spaces shall be instructed as to the nature of the hazards involved, the necessary precautions to be taken, and in the use of protective and emergency equipment required." 29 C.F.R. § 1926.21(b)(6)(i). The regulation defines a confined space as:

> any space having a limited means of egress, which is subject to the accumulation of toxic or flammable contaminants or has an oxygen deficient atmosphere. Confined or enclosed spaces include, but are not limited to, storage tanks, process vessels, bins, boilers, ventilation or exhaust ducts, sewers, underground utility vaults, tunnels, pipelines, and open top spaces more than 4 feet in depth such as pits, tubs, vaults, and vessels.

29 C.F.R. § 1926.21(b)(6)(ii).

¶ 47 After hearing oral argument at sidebar, the trial court permitted Aufie-

**11.** We note that the court reporter at trial recorded Aufiero's name as spelled "Alfiero". This was an error as this witness' name is correctly spelled Aufiero.

ro to testify as described below over Appellants' objections. We note, however, that Appellants did not object to Aufiero's qualifications as an expert. The trial court summarized Aufiero's testimony as follows:

> Mr. [Aufiero] concluded that in his opinion the oven was a confined and enclosed space. He testified that all of the regulations which govern confined or enclosed spaces take precedent when the structure is a piece of mechanical equipment such as the oven and flash assembly.
>
> * * *
>
> Additionally, Mr. [Aufiero] testified that in light of his opinion that the oven was a confined and enclosed space, the OSHA regulations about the guarding of wall and floor openings were inapplicable because those regulations are for walls, floors and stairways which are for parts of a building, not for a processing vessel like the oven. This opinion conflicted with the opinion offered by [Appellants'] expert witness, Richard Hughes, who testified that the sections of the OSHA Code relating to the guarding of floor and wall openings were applicable to this work site.

(Trial Court Opinion, 11/23/00, at 18–19 (citations omitted).) The trial court concluded that:

> whether or not the oven qualified as a confined or enclosed space was a factual issue for determination of the jury. Additionally, ... Mr. [Aufiero] was properly qualified as an expert witness in engineering. In accordance with the

Pennsylvania Rules of Evidence, it was proper to submit Mr. [Aufiero's] testimony to the jury and it was their responsibility to weigh that evidence against the opinion of Mr. Hughes and the other evidence presented in the case.

(*Id.*, at 19–20.) We agree.[12]

¶ 48 Accordingly, we hold that the trial court did not abuse its discretion in admitting Aufiero's testimony. As we have determined that the trial court did not err in refusing the disputed jury instructions or in admitting Aufiero's testimony, the trial court's decision to deny a new trial must stand. *See Harman, supra.*

¶ 49 Having found no error in the grant of partial summary judgment to PSI or in the denial of Appellants' post-trial motions, we affirm the entry of judgment in favor of PSI.

¶ 50 Judgment affirmed.

¶ 51 McEWEN, P.J.E., files a Concurring Statement.

McEWEN, P.J.E., Concurring.

¶ 1 The author of the majority expression has undertaken a careful analysis and provided an insightful presentation of view, and while I join that expression in major measure, I am able to but concur in the result, since I rely upon a differing factual predicate to conclude that the requested points for charge on the issue of agency were properly rejected.

---

12. Appellants argue that "interpreting the [OSHA] regulation is ultimately a judicial function not to be overridden by 'expert' opinion, and that the regulation's plain language controls judicial analysis." (Appellants' Brief, at 29 citing *Ed Taylor Const. Co. v. Occupational Safety and Health Review Com'n*, 938 F.2d 1265, 1272 (11th Cir.1991).) We note that decisions of the lower federal courts do not bind the Pennsylvania courts, even when a federal question is involved. *See Davis v. Resources for Human Development, Inc.*, 770 A.2d 353, 357–58 (Pa.Super.2001), and citations therein. Moreover, we do not read this case as supporting the proposition that interpretation of OSHA regulations is a matter of law.

¶ 2 The complaint in this case identified Ken Pinkerton in the caption as follows: "Joe Green Associates, and Joe Green and Ken Pinkerton as agents, servants and/or employees of Joe Green Associates, and individually".

¶ 3 Nowhere in the complaint was the Defendant Joe Green Associates alleged to be an agent of any other defendant, and no specific acts or omissions of any kind by Defendant Pinkerton were described in the complaint filed by appellants.

¶ 4 The only mention of Ken Pinkerton by name in the body of the complaint appears at paragraph 8:

8. The Defendant Ken Pinkerton is an individual and/or corporation or other entity who conducted business in Thompsontown, Pennsylvania, under and subject to the laws of Pennsylvania by providing goods and services at the Thompsontown plant of Triangle–Pacific.

¶ 5 The Answer filed by Defendant Product Systems, Inc. at paragraph 8 recited:

8. Denied as stated. Upon information and belief, Mr. Pinkerton was an employee of Joe Green Associates.

¶ 6 Appellants who caused a voluntary discontinuance to be entered as to Defendant Pinkerton, Defendant Joe Green, and Defendant Joe Green Associates, concede that "Mr. Pinkerton [was] not specifically identified as a PSI agent or employee in the pleadings" but contend "that identification was unnecessary." I disagree.

¶ 7 The record conclusively establishes that there were no allegations in the complaint which could possibly be read to suggest that Defendant Pinkerton was the agent or employee of Defendant Production Systems, Inc. Moreover, appellants have failed to identify any evidence produced at trial which would establish that Defendant Pinkerton was the agent of De-

fendant Production Systems, Inc. Under these circumstances, the trial court was required to, and did properly, refuse the requested points for charge on the agency of Ken Pinkerton.